**SIZZLER FAMILY STEAK HOUSES, a California Corporation, Plaintiff-Appellee, Cross-Appellant,**

v.

**WESTERN SIZZLIN STEAK HOUSE, INC., a Georgia Corporation; Western Sizzlin Steak House Franchises, Inc., a Georgia Corporation, and Western Sizzlin, Inc., a Georgia Corporation, Defendants-Appellants, Cross-Appellees.**

No. 85–8908.

United States Court of Appeals, Eleventh Circuit.

June 26, 1986.

Rehearing and Rehearing En Banc Denied July 30, 1986.

William J. Cooney, Augusta, Ga., Michael T. Platt, Samuel D. Littlepage, Washington, D.C., for defendants-appellants, cross-appellees.

Patrick J. Rice, Augusta, Ga., William Poms, M. Michael Carpenter, Bernard R. Gans, Los Angeles, Cal., for plaintiff-appellee, cross-appellant.

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD,* Senior District Judge.

VANCE, Circuit Judge:

This is the latest skirmish in a trademark battle which has been raging between two steak house chains since 1967. On a motion by plaintiff Sizzler Restaurants International, Inc. ("Sizzler"), the district court held defendant Western Sizzlin, Inc. ("Western") in civil contempt for violating an order restricting Western's use of the word "Sizzlin." It also imposed sanctions for the contemptuous conduct, and placed what Western claims are additional restrictions on its use of "Sizzlin." Both parties now appeal. We affirm with respect to Western's appeal and dismiss Sizzler's cross-appeal for lack of jurisdiction.

## I.

Sizzler and Western are both operators and franchisors of budget steak restaurants. Both chains, as well as several others in the same business, have expanded rapidly across the country in recent years, catering to family business by offering inexpensive steaks, potatoes, salad bars and desserts.

In 1967, Sizzler filed suit against Western, then known as "Sizzler's," for trademark and service mark infringement. The suit resulted in a 1968 judgment prohibiting Western from using the "Sizzler" mark or any confusingly similar mark. The judgment specifically permitted Western to use its current name.

The two companies apparently coexisted peacefully for the next few years. In 1980, however, Sizzler once again sued Western. It was troubled by the fact that Western had obtained federal trademark and service mark registration of the word "Sizzlin" standing alone. Western and its franchisees were using "Sizzlin" by itself as a service mark for their restaurants on some signs, and as a trademark to describe one of their steak offerings. In addition, even when "Sizzlin" appeared in tandem with "Western," the former word was often much more prominent. Sizzler contended that "Sizzlin" was confusingly similar to "Sizzler," and hence that Western should be barred from using the mark.

In 1984, after a full bench trial, the district court called the two companies together for what it termed a "final settlement conference." Although the conference did not result in an official settlement agreement, it apparently was not a complete failure. The parties agreed to waive the usual findings of fact and conclusions of law, and the court was able to fashion a judgment from which neither party took an appeal. The 1984 judgment required that Western cancel its service mark registration for "Sizzlin," though it was permitted to keep the trademark registration. Western and its franchisees were also required to modify exterior wall and pole signs at their restaurants so that any use of "Sizzlin" on such signs was accompanied by the word "Western" displayed in an equally prominent fashion. The court imposed a timetable for the conversion of signs to

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

meet requirements, and retained jurisdiction for enforcement purposes.

Skeptical of Western's ability or commitment to ensure compliance with the judgment—it seems Western ran a rather loose franchise operation—Sizzler went to considerable expense to determine whether Western's restaurants were complying with the court's requirements. It found that many were not. Close to half had not complied with the court's order that "Sizzlin" wall signs at certain restaurants be permanently disconnected from electricity by October 1, 1984. In addition, some restaurants were violating the 1984 judgment by using pole signs on which "Sizzlin" was unduly prominent, and two were found to be violating the 1968 judgment by using the term "Sizzler." Consequently, Sizzler filed a motion for contempt. In January 1985, the district court granted the motion, and in July the court entered an order awarding Sizzler $25,000. The July order also modified the 1984 judgment by prohibiting use of the "Sizzlin" trademark outside Western's restaurants. This modification was apparently in response to a special master's report that the parties disagreed as to whether Western could use the "Sizzlin" mark to advertise its "# 1 Sizzlin Steak."

In September, however, the court determined that the 1984 judgment should not have been amended. It thus vacated the July order. In its place, the court issued three separate orders in early November. In an order of November 7, it reimposed the $25,000 contempt sanction. On November 8, it reimposed the prohibition on outside use of the "Sizzlin" trademark, but this time did so in the guise of interpreting the 1984 judgment. On November 12, it entered an order establishing a schedule of prospective sanctions for future violations.

Western filed a notice of appeal from the orders of November 7 and 8 on November 12.[1] It filed an amended notice on November 14 to include the November 12 order,[2] and a second amended notice on

---

1. Because we conclude that the November 8 order modified the 1984 judgment, *see infra* pp. 1538–1539, we have jurisdiction over Western's appeal from that order. *See* 28 U.S.C. § 1292(a)(1) (interlocutory orders "modifying" injunctions appealable). We also have jurisdiction over the November 7 order and the earlier judgment of contempt. The sanction set forth in the order of November 7 was imposed as a result of the contempt finding. Entry of these orders rendered the contempt judgment final and made both the finding of contempt and the later sanction order appealable under 28 U.S.C. § 1291. *Cf. United States v. Hankins*, 565 F.2d 1344, 1352 (5th Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979) (judgment of contempt not appealable because sanction not yet imposed); *Cabrera v. Municipality of Bayamon*, 622 F.2d 4, 7 (1st Cir.1980) (civil contempt order entered after final judgment is appealable).

Even if the 1984 judgment is not considered a final judgment for this purpose, the former fifth circuit recognized an applicable exception to the general rule that a civil contempt order against a party to an ongoing proceeding is not appealable absent a final judgment. In *Drummond Co. v. District 20, United Mine Workers*, 598 F.2d 381, 383–84 (5th Cir.1979), the court permitted an appeal by parties to an action from a finding of civil contempt for violation of an injunction, even though the underlying action had not been finally resolved. The court reasoned that a tru-

ly "final decision" might never issue, that review of the contempt judgment would not disrupt the continuing proceedings below, and that the findings of contempt and the sanctions imposed were not by their terms subject to modification. These factors are present here as well.

2. We asked the parties to submit memoranda on the issue of whether we have jurisdiction over the appeal from the November 12 order, or whether the order becomes a final decision for the purpose of appellate review only when one of the now-prospective fines is actually imposed. *See supra* note 1. The parties apparently found no cases on point. Other than a bit of dicta from a 45-year-old third circuit decision, *In re Eskay*, 122 F.2d 819, 824 (3d Cir.1941), which in turn cites an even older Massachusetts case, *Cherry v. Cherry*, 253 Mass. 172, 148 N.E. 570 (1925), we also have found none.

We conclude that the November 12 order is appealable as a final decision. In imposing a prospective fine scale, the court hopes that the threat of fines will coerce compliance so that actual imposition of fines is not necessary. Thus, while in one sense a prospective fine schedule is a conditional future sanction, it also serves as an unconditional present sanction. Being placed under the threat of future sanction *is* a present sanction. That is evident from the fact that prospective fines are an extraordinary remedy. *See infra* p. 1536. The reluctance of courts to allow prospective sanctions

December 9 to clarify that it intended also to appeal the underlying finding of contempt.[3] Sizzler filed a notice of cross-appeal on December 19 from the November 7 order, claiming that the $25,000 award was too small.

## II.

### A. *The Contempt Order*

■■■ Western first argues that the district court abused its discretion [4] in holding Western in contempt. The company acknowledges that contempt may serve two purposes. It "can be either coercive, which is intended to make the recalcitrant party comply, or compensatory, which 'reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance....'" *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458 (11th Cir.1984) (quoting *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir.1976)). Western suggests, however, that the contempt judgment in this case served neither purpose. It could not have been coercive, Western argues, because Western had cured or had taken steps to cure all the violations reported by Sizzler by the time the contempt judgment was entered. It could not have been compensatory, the company continues, because Sizzler submitted no proof of damage caused by Western's allegedly contemptuous conduct. Although the district court stated that the sanction of $25,000 was intended to compensate Sizzler for expenses it incurred in policing Western's compliance,

Western argues that these expenses were not actually brought about by Western's failure to comply. Since Sizzler would have incurred the expenses whether or not it found any violations, Western contends, it cannot be said that Sizzler incurred the expenses *because of* the violations.

■■■ We believe that the district court's judgment of contempt and the accompanying sanction served a valid compensatory purpose.[5] Western's argument that Sizzler's expenses were not incurred "because of" the violations, while ingenious, cuts so broadly that accepting it would require us to ignore both binding precedent and common sense. Under Western's theory, no expenses incurred by the moving party in an effort to enforce compliance by the party's opponent could ever be reimbursed in a contempt action. Attorney fees, for instance, could not be awarded to a prevailing movant. It would not be precisely accurate to say that the fees were incurred "because of" the contemnor's contemptuous conduct, since the attorney would have put in the time even if the court had found no contempt. Under our precedents, however, an award of attorney fees to the injured party in a civil contempt case is within the district court's discretion. *See, e.g., Northside Realty Associates v. United States*, 605 F.2d 1348, 1356 n. 23 (5th Cir.1979). Indeed, reimbursement to a prevailing movant may include "expenses reasonably and necessarily incurred in the attempt to enforce compliance." *Rickard*, 735 F.2d at 458 (quoting

---

stems from the understanding that a party under a specific threat of future sanctions is in a different, more serious, often worse situation than one not under such a threat, even if the future sanctions are never imposed. In at least one sense, then, the November 12 order imposes a present remedy and hence is appealable.

**3.** Although this second amendment was a nullity since it fell outside the thirty day appeal period, *see* Fed.R.App.P. 4(a), the original notice and amendment were sufficient to bring the underlying contempt order before this court along with the November orders. *See supra* note 1.

**4.** Abuse of discretion is the correct standard of review. *In re Newton,* 718 F.2d 1015, 1022 (11th

Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984). A finding of contempt must be based on clear and convincing evidence that the contemnor violated a court order, *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984), but in this case Western concedes that violations had occurred.

**5.** While we thus need not consider whether the contempt citation served a valid coercive purpose, we do note that the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge. *See infra* p. 1537 ("reasonable diligence" or "all reasonable efforts" needed).

*Banner,* 529 F.2d at 827). This rule is sensible as well as binding. It provides parties with an added incentive to monitor and enforce an opponent's compliance with a court order by allowing them to recover their expenses in exposing noncompliance. Yet by conditioning reimbursement on enforcement success, it discourages parties from wasting resources on scavenging for nonexistent violations.

 Each party to a court order is responsible for ensuring its own compliance with that order and for shouldering the cost of compliance. Western did not fulfill this responsibility. It admits to numerous violations which it did not discover or correct until after Sizzler moved for contempt. That Western may have acted to correct the violations after learning of them does not change the fact that Western failed to mount and pay for its own effective enforcement efforts. Rather than let Western freeload off the efforts of Sizzler, the district court found Western in contempt and imposed a modest sanction.[6] While it may be true in a technical sense that Sizzler was reimbursed for expenses which it would have incurred even if Western had been in complete compliance, it is certainly more equitable for Western to absorb the cost of policing its franchisees than for Sizzler to do so. We find no abuse of discretion in the court's finding of contempt or its decision to impose a sanction.

B. *Attorney Fees*

Western next argues that the district court erred in awarding Sizzler attorney fees as part of the $25,000 contempt sanction. While not specifically challenging the rule noted above that a fee award is within the discretion of the district court, Western suggests that such an award was an abuse of discretion in this case because the contemptuous conduct was not willful. In support of the proposition that only willful contempt can lead to an award of attorney fees Western cites three cases: *Fleisch-*

*mann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126 (2d Cir.1979); and *In re Federal Facilities Realty Trust,* 227 F.2d 657 (7th Cir.1955).

We read these cases differently. As part of a discussion of exceptions to the general American rule against fee awards, all of which was dicta, the Court in *Fleischmann* stated that "in a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized." 386 U.S. at 718, 87 S.Ct. at 1407. It did not say, and certainly did not hold, that a fee award cannot be made in the absence of willful disobedience. *Vuitton* is to the same effect. *See* 592 F.2d at 130. *Federal Facilities* simply suggests that the degree of willfulness is "a major consideration in determining whether attorney's fees should be awarded to the opposing party." 227 F.2d at 658. In that case the seventh circuit was considering whether to award fees following a judgment of contempt for violation of one of the circuit court's own orders. It was exercising its own discretion, not reviewing a lower court's discretionary action.

 We read these three cases to say not that willfulness is necessarily a prerequisite to a fee award, but rather that willfulness is a commonly accepted justification for awarding attorney fees. Perhaps they may also suggest that lack of willfulness generally mitigates against a fee award. We do not, however, believe that they stand for the proposition that an award of fees in the absence of willful contempt is automatically an abuse of discretion.

Although the definition varies somewhat from context to context, willfulness generally connotes intentional action taken with at least callous indifference for the consequences. *See, e.g.,* 46 Words & Phrases 1, 1–16 (1970 & Supp.1985). As Western correctly notes, there is no evidence of willful

---

**6.** Although we do not have jurisdiction over Sizzler's cross-appeal, *see infra* p. 1541, the record supports Sizzler's contention that its enforcement expenses greatly exceeded $25,000. The district court acknowledged that the sanction covered only a portion of those expenses.

violation here. The district court did find, however, that the violations resulted from Western's failure to take reasonable steps to police its franchisees. The court found Western's correspondence with its restaurants to be "vague, incomplete, and, if not misleading, disingenuous." It concluded that Western's notices to its franchisees were "tardy to say the least," and that the notices contained incorrect instructions. It found that "the number of contacts and letters to the franchisees and the variety of their origins was undoubtedly confusing," and that "the prospect of obfuscation created by [Western's] telephone calls, notices, announcement, and attorney's letter is obvious." It concluded that "[t]he result should have been predictable."

■ The district court's findings, which are amply supported by the record, suggest that the violations of the 1984 judgment, if not the necessary or probable consequence of Western's inadequate enforcement efforts, were at least a reasonably foreseeable consequence. Although perhaps not as worthy of sanction as a party in willful violation of a court order, Western demonstrated no small degree of indifference to the command of the court. We hold that it was not an abuse of discretion for the district court to award attorney fees under these circumstances.

## C. *Prospective Fines*

■ Western's third contention is that the district court erred in imposing a scheme of prospective fines for future violations. Noting that the imposition of prospective fines "is an extraordinary remedy and should be imposed only where violations have been flagrant and lesser remedies appear likely to fail," *NLRB v. A.W. Thompson, Inc.*, 651 F.2d 1141, 1145 (5th Cir.1981),[7] Western argues that the district court abused its discretion[8] by imposing

such fines here. Western also contends that the fine schedule improperly imposes "strict liability" on the company for violations by its franchisees, over which it does not have complete control. We reject both arguments.

■ It is important first to note that under the scheme imposed by the court, the prospective sanctions are automatic only for violations not initially brought to the court's attention by Western. Hence, the sanctions are best viewed as being prompted not so much by past violations of the judgment as by Western's inadequate policing of its franchisees. This is an important distinction, for it means that in considering the propriety of the sanctions under the *Thompson* standard our focus is not on the flagrancy of past violations and the likelihood of future ones absent the prospective fines. Rather, our focus must be on the flagrancy of Western's past inadequate enforcement efforts, and the likelihood that absent the fines those efforts would continue to be inadequate.

Although "flagrant" includes a degree of willfulness as well as openness, *see, e.g.*, 17 Words & Phrases 244, 244 (1958 & Supp. 1985), our conclusion above that the violations of the 1984 judgment were not willful does not preclude a finding that Western's inadequate enforcement efforts were also not willful. There is nothing to indicate that Western intentionally set out to devise a bad enforcement plan. It is hardly surprising, however, that an enforcement plan consisting of self-policing by franchisees, inaccurate descriptions of the franchisees' responsibilities, confusing letters and late reminders left something to be desired. That the plan turned out to be as bad as it was is additional evidence that Western may not have cared whether the plan was effective. If Western had truly wanted to

---

7. Although "prospective fines ... have been imposed in certain instances where the company was not in flagrant violation," *Florida Steel Corp. v. NLRB*, 648 F.2d 233, 240 (5th Cir. Unit B 1981) (citing ninth, third and D.C. circuit cases), the *Thompson* rule is binding in this circuit.

8. A court has broad discretion in fashioning a contempt sanction. *See Soobzokov v. CBS, Inc.*, 642 F.2d 28, 31 (2d Cir.1981).

establish an effective plan, it might have turned to the mechanism effectively employed by Sizzler: personal inspections. Alternatively, Western might have coupled its self-policing policy with a serious threat of franchise revocation or legal action against wayward franchisees.

■ The facial weakness of the Western enforcement effort, the ex post evidence of its failure, and the existence of better alternatives all point to the conclusion that Western was not terribly concerned whether its enforcement efforts succeeded. Certainly the company did nothing to conceal the plan's flaws or the violations those flaws permitted. We find adequate grounds for the district court to have concluded that Western's past indifference toward adequate enforcement was flagrant.

There is also adequate support for the conclusion that without the prospective sanctions Western's enforcement efforts would continue to be ineffective. Although it may be that being held in contempt prompted Western to upgrade its efforts to some extent, it is apparent that the efforts were not upgraded enough. The court found—and counsel for Western admitted—that violations continued even after the court had entered its contempt order.

■ Western's "strict liability" argument is no more persuasive than its *Thompson* argument. It would, of course, be improper to make Western strictly liable for all violations by its franchisees. Western is responsible only for "reasonable diligence" in enforcement, *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir.1984), or perhaps for "all reasonable efforts" to achieve compliance, *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984). The prospective fines at issue here, however, do not make Western liable for all violations. As we noted above, the fines come into play automatically only when Western is not the first to bring a violation to the court's attention. Western may avoid operation of the prospective sanctions entirely by promptly informing the court of any violations. In essence, the district court concluded that while "reasonable diligence" does not require perfect compliance, it does require Western to become aware of violations quickly—through its own efforts, not those of Sizzler—and to set about correcting them. Such a conclusion is quite reasonable. Any time a violation occurs, even an unavoidable one, the costs of discovering the violation and bringing it to the court's attention, of possible confusion between Western and Sizzler, and of correcting the problem must fall on one party or the other. It is only fair that the burdens resulting from violations by Western franchisees be borne by Western and not by Sizzler. The prospective sanctions are properly designed to ensure that they are.

Even if it would be unreasonable for the district court to impose a fine for each and every violation not initially reported by Western, no matter how quickly corrected and no matter how diligent Western's enforcement efforts, the prospective fine schedule does not irreversibly commit the court to do so. The schedule lets Western know that if its efforts are inadequate it may expect to incur a fine. The court, however, retains inherent power to waive the sanction in a particular case. In fact, should Western in the future satisfy the court that it is policing its franchisees with appropriate diligence, the court could easily decide to rescind the prospective sanctions entirely.

### D. *Likelihood of Confusion*

■ Western's next contention is that the district court's entry of a finding of fact as to likelihood of confusion was improper. Western claims that the 1984 judgment was essentially a consent judgment and argues that the parties' agreement to waive findings of fact was part of their settlement. It also argues that the court made its finding that "Sizzler" and "Sizzlin" are confusingly similar without considering Western's potentially meritorious defenses to that claim, and that Western was therefore denied due process of law.

The nature of the 1984 judgment is a more important issue than it may seem. A consent judgment is not based upon findings of fact. If the judgment was a consent judgment, and particularly if the parties agreed as part of their settlement not to have findings of fact entered, then the district court should not have entered such a finding. On the other hand, as Sizzler notes, it is a different story if the judgment was not by consent. In that case, if the court had not originally found "Sizzler" and "Sizzlin" to be confusingly similar it would have had no reason to restrict Western's use of the "Sizzlin" mark. Thus, if the judgment was imposed instead of agreed to, all the court did by later entering a specific finding as to confusion was to make explicit something that had been implicit in the judgment all along.

We recognize that the 1984 judgment was entered following a "settlement conference" called by the court, and that no appeal was taken from the judgment. Neither of these facts, however, resolves the key question: was the judgment the result of a negotiated agreement between the parties, or was it a decree imposed on the parties by the court?

In considering this question, the district court acknowledged that

> [i]n certain respects, the judgment of June 12, 1984, is similar to a "consent judgment." Apparently no one disagreed with it. However, it was not a "consent judgment" in the usual sense. It was not proposed by the parties. The judgment was the product of judicial consideration and decision. Its language was formed by the court. The parties did not author in its original or final draft.

In addition, there is no evidence in the record that the parties ever signed any kind of settlement document or that they ever explicitly consented to be bound by any particular judgment. They did sign a document waiving explicit findings of fact, but this they apparently did for the convenience of the court, not because it was part of any settlement. That they signed such a waiver at all is evidence that neither they nor the court viewed the judgment as a consensual decree, for findings of fact are not necessary to support consent judgments. *See* Fed.R.Civ.P. 52(a) (court shall make findings of fact "[i]n all actions tried [by the court] upon the facts"); *United States v. Scholnick*, 606 F.2d 160, 166 (6th Cir.1979).

We therefore come to the conclusion that the 1984 judgment was not by consent. That means an implicit finding of confusing similarity has been part of the judgment from the beginning. That implicit finding came following a trial on the merits and at a time when the district court was fully aware of any potential defenses. Western cannot complain that it was denied due process merely because the district court later changed an implicit finding to an explicit one.

### E. *Clarification or Amendment of the Judgment*

Western next argues that the district court's November 8, 1985 order, in which the court prohibited Western from using the trademark "Sizzlin" standing alone outside its restaurants, was an improper modification of the 1984 judgment.

We agree that the November 8 order, although by its terms entered "[f]or the purpose of explaining, fulfilling the intention, insuring compliance, properly enforcing, and otherwise clarifying" the 1984 judgment, was in reality a modification of that judgment. At the time of the judgment Western held a combined trademark/service mark federal registration for the term "Sizzlin." The 1984 judgment required Western to give up the "Sizzlin" service mark but permitted it to keep the trademark. Paragraph 8 of the judgment provided that the registration

> be *canceled* only insofar as it was issued for: "Restaurant Services ..." so that the defendant may not further use such trademark/service mark for origin of restaurant services or exterior wall or 'pole' signs, but so that the defendant Western Sizzlin, Inc., may use such

trademark/service mark ... "for cooked steak dishes for consumption on or off the premises...."

This is all the judgment has to say about Western's use of "Sizzlin" as a trademark. Nowhere does the judgment state or even imply that the court intended such use to be restricted to within Western's restaurants.[9]

It may be that the court intended to impose such a restriction, but even the court itself apparently realized that it had not in fact done so. The "interpretive" order entered on November 8 was earlier issued in similar form as an explicit modification to the 1984 judgment. That order was withdrawn when, upon Western's motion for reconsideration, the court concluded it would be best to leave the 1984 judgment in its original form and instead to enter an order "explaining" and "enforcing" that judgment.

What matters, however, is not the district court's characterization of its order as amendatory or explanatory, but rather the actual effect of the order on the obligations of the parties as set forth in the original judgment. We believe it is clear that the November 8 order imposed a significant restriction on Western's use of its trademark which is simply not to be found in the 1984 judgment. The order was a modification of the judgment; calling it interpretive does not make it so.

■ Nevertheless, we see nothing wrong with the district court's action because we believe modification of the 1984 judgment was well within the court's power. It used to be that only new and unforeseen circumstances could justify modifica-

tion of an order. *See United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). In *Exxon Corp. v. Texas Motor Exchange*, 628 F.2d 500, 503 (5th Cir.1980), however, the former fifth circuit noted that the Supreme Court has now "rejected the use of the *Swift* test for deciding whether to impose additional restrictions on a defendant." That rejection came in *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), where the Supreme Court

> instructed the district court to determine whether the relief originally ordered had produced the intended results. "If it has not, the District Court should modify the decree so as to achieve the required result with all appropriate expedition."

*Exxon*, 628 F.2d at 503 (quoting *United Shoe Machinery*, 391 U.S. at 252, 88 S.Ct. at 1501). The *United Shoe Machinery* holding "indicates that an injunction may be modified to impose more stringent requirements on the defendant when 'the original purposes of the injunction are not being fulfilled in any material respect.'" *Id.* (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2961 (1973)).[10]

In this case, the purpose of the judgment was obviously to protect the "Sizzler" mark by decreasing the possibility of confusion between "Sizzler" and Western's mark "Sizzlin." The main problem complained of by Sizzler at trial was that some Western franchisees were using the term "Sizzlin" standing alone, or in conjunction with "Western" but more prominently, on

---

**9.** Western apparently made some effort to contact one of its franchisees who was using the "Sizzlin" trademark in advertising, and to stop a manufacturer of take-out food containers from using in its advertising a photograph of a Western take-out container emphasizing "Sizzlin" over "Western." This does not, however, mean that Western actually read the 1984 judgment to prohibit these uses. After being held in contempt Western may have simply decided to take a cautious approach toward *potential* violations, or violations of the "spirit" of the injunction, of which it became aware. There has never been any claim that Western actively sought to

thwart the will of the court, or that it has not attempted to remedy those violations of which it became aware. Rather, Sizzler's complaint, and the district court's conclusion, was that Western's efforts at tracking down violations have been inadequate.

**10.** Western argues that courts should be particularly reluctant to amend consent judgments. This argument is moot given our holding above that the judgment at issue here was not a consent judgment. *See supra* p. 1538.

wall and pole signs. The court's original judgment dealt with this problem. After entry of the judgment, however, it became apparent that there were various other uses of the word "Sizzlin" by Western franchisees which could also cause confusion but which were not specifically dealt with in the original judgment. Some restaurants, for instance, had "Sizzlin" signs on their roofs. Even though the 1984 judgment was silent as to such signs in that the judgment was confined to signs of the wall and pole variety, it could hardly be said that the court's intended result was to allow such signs. Rather, the logical conclusion is that it was the court's intent to bar Western from using confusing signs—that the question of *roof* signs simply had not previously arisen. Western apparently agrees; it has not challenged that part of the November 8 order extending the reach of the 1984 judgment's sign requirements.

The trademark problem, while not as clear cut as the roof sign example, is nevertheless similar. It is true that the 1984 judgment by its terms did not forbid use of the "Sizzlin" trademark outside Western's restaurants. We cannot say, however, that simply because its judgment did not forbid such use the district court must have intended to permit it. It is just as likely, if not more so, that the court never considered the problem. We do not know whether the court knew at the time of the judgment that the trademark was sometimes used in advertising. There is no evidence that it did. On the other hand, we do know that when evidence of trademark use outside the restaurants came to the court's attention, the court modified its judgment to prohibit such use. The court evidently concluded that the original judgment as written was insufficient to fulfill the purpose for which it was intended—halting public confusion.[11]

Under *Exxon*, therefore, the November 8 order was proper even though in our view it was a modification of the 1984 judgment.

## F. Incontestability

Western's final contention is that the district court had no power to restrict use of the "Sizzlin" trademark because that mark had become incontestable under 15 U.S.C. § 1065. That section provides that subject to certain exceptions not relevant here,

the right of the registrant to use [a] registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: *Provided,* That—

. . . .

(2) there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and the other matters specified in subsections (1) and (2) of this section. . . .

15 U.S.C. § 1065.

Although Western filed an affidavit of incontestability in July 1984, we disagree with the proposition that the "Sizzlin" trademark ever became incontestable. Subsection (2) above requires that for a mark to become incontestable there must be "no proceeding involving said

---

**11.** The district court could not, of course, impose restrictions on Western's use of its trademark merely because of continuing violations by Western of the court's previous restrictions on use of the service mark. Contempt as to certain conduct may justify additional enforcement measures regarding that conduct, but can-

not without more justify restrictions on some other, unrelated conduct. Western does not contend here that the trademark restriction was prompted by the earlier finding of contempt, and in any event we will not impute a possible improper motive to a district court where a proper justification is, in our view, more likely.

right pending ... in a court and not finally disposed of." This provision is fatal to Western's argument, for this case was pending at the time Western filed its affidavit. The district court had already rendered the 1984 judgment, but the court had explicitly retained jurisdiction for the purpose of ensuring compliance with its order. It is true, as Western points out, that the 1984 judgment left Western free to use "Sizzlin" as a trademark. That judgment did not, however, transform the case into one not "involving" Western's trademark rights. Sizzler's original complaint in the case challenged Western's right to "Sizzler" both as a service mark and as a trademark, and later events have demonstrated that the district court retained the power to modify the 1984 judgment to restrict use of the "Sizzler" trademark. Indeed, Western's argument contains the seeds of its own destruction. The very fact that Western is now before this court defending its right to use the trademark, in an appeal which is part of a case continuously pending since 1980, shows that there was a "proceeding involving said rights pending ... in a court and not finally disposed of" in 1984.[12]

### G. *Cross-Appeal*

■ Sizzler contests the size of the contempt sanction imposed against Western, claiming that the $25,000 award was too small because it was insufficient to cover the expenses it incurred in policing Western's compliance.

We lack jurisdiction to consider this contention because the cross-appeal was not timely filed. Under Fed.R.App.P. 4(a)(3), a cross-appeal must be filed within fourteen days after the date on which the original notice of appeal was filed, or within thirty days after entry of the judgment appealed from, whichever is later. Sizzler's cross-appeal, taken from the court's order of November 7, 1985, was filed on December 19—outside the thirty day period. The original notice of appeal was filed by Western on November 12—more than 14 days before December 19. Thus, Sizzler's cross-appeal was not timely under either of the standards set forth in Rule 4(a)(3). The appeal is therefore not properly before us.

The orders of the district court are AFFIRMED.

---

12. The mere fact that a court modifies a judgment, or imposes a contempt sanction for violation of a judgment, does not mean the action is necessarily "pending" for the entire period between judgment and later action. A court retains inherent power to modify a judgment in some circumstances and to enter a finding of contempt even after all would consider the original case to be closed. In this case, however, the court explicitly kept the proceeding alive to ensure compliance with the judgment. The court thus obviously intended to take further action if necessary, and in fact did so only six months after the 1984 judgment.