**SHADY RECORDS, INC., Plaintiff,**

v.

**SOURCE ENTERPRISES, INC., David Mays, Raymond Scott p/k/a Ray Benzino, and Black Enterprise/Greenwich Street Corporate Growth Management LLC, Defendants.**

No. 03 Civ. 9944(GEL).

United States District Court, S.D. New York.

June 8, 2004.

See, also, 351 F.Supp.2d 74, 2004 WL 1325795.

Donald N. David, Kenneth G. Schwarz, Bruce N. Lederman, Michael Korsinsky, Brian Bloom, Fischbein, Badillo, Wagner, Harding New York, NY, for plaintiff Shady Records.

Michael S. Elkin, Thomas P. Lane, Hermann Ferre, Deborah L. Ander, Thelen Reid & Priest, LLP, New York, NY; Londell McMillan, Frank C. Salzano, The McMillan Firm, New York, NY, for defendant Source Enterprises.

**OPINION AND ORDER**

LYNCH, District Judge.

In this action for copyright infringement, plaintiff Shady Records, Inc. ("Shady") argues that defendants, various corporations and individuals associated with the magazine The Source ("Source"), infringed its copyright in certain songs allegedly created by the performer Eminem by posting recordings of those songs and printed versions of their lyrics on the

magazine's website.[1] On December 15, 2003, this Court entered a temporary restraining order prohibiting Source from "[r]eproducing, distributing or publicly performing or in any way making available any hard copy or electronic copy" of the songs.[2] Shady now moves for an order holding defendants in contempt of that order.[3] The Court held an evidentiary hearing on that motion on April 5, 2004, after which the parties submitted written arguments. Having considered the evidence presented at the hearing and the arguments of the parties, the Court will grant the motion.

## LEGAL STANDARDS

■ "It is well settled in this circuit that a party may be held in civil contempt for failure to comply with an order of the court if the order being enforced is clear and unambiguous, the proof of noncompliance is clear and convincing, and the defendants have not been reasonably diligent and energetic in attempting to accomplish what was ordered. It is not necessary to show that defendants disobeyed the district court's orders willfully." *EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (citations and internal quotation marks omitted).

■ Shady moves for an order of civil contempt. Civil contempt is intended either to "coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1352 (2d Cir.1989); *see also Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 115 (2d Cir.1988) ("If the sentence of contempt is imposed for the coercive or remedial purpose of compelling obedience to a court order and providing compensation or relief to the complaining party, the contempt is civil in nature."). Profits derived by the contemnor from violating the order may be "an equivalent or a substitute for legal damages, when damages have not been shown, and are recoverable not by way of punishment but to insure full compensation to the party injured." *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 6 (2d Cir.1989), citing *Leman v. Krentler–Arnold Hinge Last Co.,* 284 U.S. 448, 455–56, 52 S.Ct. 238, 76 L.Ed. 389 (1932) (internal quotation marks omitted).

In this case, there is no need for a coercive order, as the parties agree that Source is now in compliance with the

---

1. This copyright dispute and the context behind it are described more fully in a companion Opinion, also issued today, on a motion by Shady to dismiss various counterclaims asserted by Source, and for sanctions pursuant to Fed.R.Civ.P. 11 based on those counterclaims.

2. The Order was modified on December 23, 2003, to permit Source to utilize a limited amount of content in the interest of "fair use" criticism and journalistic commentary regarding the songs. The modifications are not material to the issues before the Court on the present motion.

3. Shady seeks a finding of contempt only against Source Enterprises, David Mays, and Raymond Scott, and not against defendant Black Enterprise/Greenwich Street Corporate Growth Management LLC. (*See* P. Br. 1.) No evidence whatsoever was introduced during the contempt proceedings indicating that defendant Raymond Scott played any role or had any responsibility in connection with the actions complained of. Accordingly, there is no basis for a finding of contempt on Scott's part. For the remainder of this opinion, the terms "defendants" and "Source" will include defendants Source Enterprises, Inc. and David Mays, unless the context clearly indicates otherwise.

Court's order and has been since January 6, 2004, shortly after Shady complained to it of the matters that are the subject of this motion, before the motion itself was even filed. Nor does Shady claim that it suffered damages from the exploitation of its intellectual property, or that Source derived any profits from the alleged violation.

Shady does claim that it should be compensated for its legal fees incurred in preparing and prosecuting this motion. Our Court of Appeals has stated that in order to award attorneys' fees, a district court must find that a contempt was willful. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1063 (2d Cir.1995). But the statement in *King* is dictum, as the Court did not ultimately rule on the propriety of the attorneys' fees award in that case. *See id.* Moreover, the authority relied upon for the statement in *King* did not themselves squarely hold that such an award would necessarily be inappropriate in the absence of a finding of willfulness, nor did the Court cite any cases where such an award had been reversed. *See Sweater Bee*, 885 F.2d at 8 (declining to award fees in the absence of a finding of wilfulness on grounds that "courts in this Circuit generally award [fees] only where violation of a court order is found to have been willful"); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130–31 (2d Cir.1979) ("Since the plaintiff should be made whole for the harm he has suffered, it is appropriate for the court also to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful.").

Subsequently, and again in dictum, the Court has suggested that "willfulness may not necessarily be a prerequisite to an award of fees and costs," though a finding of willfulness "strongly supports granting them." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996). The Court has twice since noted the contrasting dicta in *King* and *Stein*, and stated that whether willful contempt is a prerequisite for an attorneys' fee award remains an open question in this Circuit. *North American Oil Co. v. Star Brite Distributing, Inc.*, No. 00–9526, 2001 WL 792643, at *2 (2d Cir. Jul.9, 2001); *Jaeger v. Massis*, No. 00–7390, 2000 WL 1678778, at *3 (2d Cir. Nov.3, 2000).[4]

As the Eleventh Circuit has noted, permitting an award of attorneys' fees serves a significant purpose where a contempt has been found by providing parties with "an added incentive to monitor and enforce an opponent's compliance with a court order by allowing them to recover their expenses in exposing noncompliance." *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1535 (11th Cir.1986). In a case of this sort, where the allegedly contumacious conduct was quickly detected and ended, failure to compensate the expenses of enforcing the order, where the defendants' behavior was genuinely, if not willfully, worthy of a contempt sanction would not only permit the offender to violate the court's order with impunity, but would leave the party that obtained the order worse off for its efforts to secure compliance with its rights and the court's command. Accordingly, the Court concludes that an award of attorneys' fees would be

---

**4.** The Second Circuit prefers to pretend that such summary orders are not decisions of the Court, and discourages their citation. *See* Second Circuit Rules § 0.23. However, given that the courts may and do freely cite law review commentary by second-year law students, it seems willfully perverse to overlook the publicly-expressed views of such distinguished authorities on Second Circuit law as Chief Judge Walker, Judges Oakes, Leval, Jacobs, and Sotomayor, and the late Judge Fred Parker, all of whom joined in the cited summary orders, on what issues are or are not foreclosed by Circuit authority.

an appropriate sanction if Source is held in contempt, whether or not the contempt was willful.

## FACTUAL FINDINGS

Shady argues that the appearance of the lyrics of the contested songs on Source's website on or about January 6, 2004, constitutes a contempt of this Court's orders of December 15 and 23, 2003.[5] Shady has established, and indeed Source has conceded, that the lyrics were available for public download on January 6, 2004. Source does not dispute that the Court's order unambiguously prohibited defendants from "making available any ... electronic copy" of the songs, or that the availability of the full text of the lyrics on the website on January 6, 2004, was a clear violation of the Court's orders. It does argue, however, that defendants were "reasonably diligent and energetic in attempting to accomplish what was ordered," *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.1981), and that at a minimum, any failure to comply was not willful.

Before addressing this contention, it will be useful to outline the evidence regarding the violation of the order. Brian Bloom, an associate at Shady's law firm, testified that upon returning to work after a short vacation on the morning of January 6, 2004, he visited Source's website, as he had regularly done in the past, to check for compliance with the Court's order. He discovered that the website contained a banner headline that included an instruction to "Click Here for Lyrics" that led the viewer to a page that displayed and permitted the downloading of the lyrics of the disputed songs. (PX 6, Bloom Aff. ¶¶ 9–10 & Ex. G, H.)[6] On further exploration, Bloom discovered other links on the site to the same material. (*Id.* ¶¶ 11–12 & Ex. I, J.) He reported the matter to Kenneth Schwarz, a partner at the firm, who testified that he also examined the site, and confirmed the presence of the links and lyrics. (PX 5, Schwarz Aff. ¶¶ 2–4 & Ex. A.) Schwarz immediately took steps to notify Source's lawyers of the claimed breach. (*Id.* ¶ 4.)

While defendants initially argued that these observations did not reflect the true content of the website as of January 6, but rather were the result of the witnesses' connecting to prior versions of the website that were "cached" in their computers (D.Br.4), this contention has now been abandoned. David Mays, Source's CEO, acknowledged that he himself visited the website on January 6, after being advised of Shady's complaint, and saw that Shady's

---

**5.** Shady also complains that Source violated the Court's order by failing promptly to comply with the Court's original temporary restraining order. Shady's post-hearing memorandum, however, concentrates almost exclusively on the events of January 6, and refers to prior events largely insofar as they are relevant to the issues of diligence or willfulness in connection with the January 6 episode. Moreover, Shady did not bring its motion in response to Source's sluggish initial response to the Court's orders, but rather moved in the wake of the reappearance of the forbidden material on the website on January 6. Finally, much of Shady's argument for willfulness hinges on the contention that Source *did* fully comply with the order, at least at some point, and then willfully un-

dertook to violate the order by returning the material to the website in early January. Accordingly, the Court regards any claims of earlier violations of the order as abandoned, and will deal in this opinion solely with the alleged violation of the order on or about January 6.

**6.** The Court received the direct testimony of plaintiff's witnesses in affidavit form. Both witnesses appeared in person at the hearing and were cross-examined, permitting credibility judgments to be made. The Court found both Bloom and Schwarz to be highly credible witnesses, both in terms of truthfulness and carefulness with the facts.

contentions "were accurate" and that the lyrics were "still on the website." (Tr. 52.) Counsel for Source explicitly conceded that the lyrics "were there," obviating the need for Shady to offer proffered expert testimony on the plausibility of the Source's earlier "caching" argument. (Tr. 135.) [7] Mays's testimony and counsel's concession conclusively resolve any possible dispute about whether the lyrics were on the website on January 6 or not. They were.

Shady argues that the appearance of the links and lyrics on January 6 was willful. The argument rests principally on inferences from four sorts of evidence. First, Shady claims that the links in effect had been removed after December 23, and reappeared on or about January 6. It accordingly infers that the lyrics must have been returned to the website by conscious agency. Second, Shady contends that Source initially took no steps to comply with the Court's December 15 order, but deferred its compliance until after the entry of the modified order on December 23. It argues that an adverse inference about Source's intent can be drawn from this "arrogan[t]" prior similar act. (P. Summ.Br.10.) Third, Shady argues that the method of compliance Source now claims to have adopted was intrinsically inefficient and inadequate, and amounts at a minimum to reckless disregard of the likelihood that it would fail to achieve full compliance. And

fourth, Shady cites the shifting and contradictory positions espoused by Source in its legal submissions and in testimony from various witnesses as evidence that its protestations of good faith should be discredited. Source, in contrast, argues that it acted with reasonable diligence and energy to comply with the Court's order, relying primarily on the testimony of Mays, corroborated by Source's former head of technology, Harold Aris, that in response to the Court's order he instructed Aris on December 16, 2003, to "take all that material down immediately." (Tr. 48–49.)

■ Based on the record evidence, the Court has no hesitation in finding that Source was not "reasonably diligent and energetic in attempting to accomplish what was ordered." Despite Mays's testimony that he instructed all of the contested material to be removed on December 16, Bloom testified credibly, corroborated by contemporaneous correspondence between counsel, that links remained or reappeared on the webpage on that date. (PX 6, Bloom Aff. ¶¶ 5–7 & Ex. C, D, E.) Moreover, Source's initial memorandum in opposition to the contempt motion asserted that the Source defendants had deliberately "continued to make certain portions of the recordings and lyrics available on [Source's] website" after the Court's initial order, "pursuant to their fair use rights." [8]

7. Unaccountably, counsel appears to retreat from this authoritative concession in Source's post-hearing memorandum, which reports that counsel had merely suggested that "the assumption that hyperlinks to the printed lyrics ... were available on the Source's website as of January 6" "be made for the sake of efficiency and simplicity." (D. Summ. Br. 5–6 & n. 7.) This flatly mischaracterizes the record. What counsel actually said was "I think we concede those links were there, as Mr. Mays testified to." (Tr. 135.)

8. On December 23, the Court modified its original order to permit the use of a specified

limited amount of material from the contested songs for journalistic purposes as a matter of fair use. Source does not contend that its continued posting of the material in the interim between orders was in any manner consistent with that ultimately permitted by the Court; to the contrary, the evidence indicates that the material that remained on the site included "the subject sound recordings in toto." (PX 6, Bloom Aff. ¶ 6.) Mays testified that Source in fact decided not to take advantage of the limited permission to quote from the songs provided by the modified order. (Tr. 50.) Source thus cannot plausibly argue that the subsequent order in any way vindi-

(D.Br.3.) Source also submitted an affidavit by Cyejuan Washington, identified as a technology analyst for Source, who stated that Mays ordered his technology department to remove the disputed material from the website "[c]onsistent with the *December 23, 2003 modified TRO.*" (Washington Decl. ¶ 3.) Source's effort to disavow these admissions as "mistake[s]" (Tr. 62, 63), which resulted from the haste of counsel and errors. by an undisclosed witness (identified only as being neither Aris nor Mays) (Tr. 120), are unavailing. Taken in the light most favorable to Source, it appears at a minimum that a Source witness (perhaps Washington), who was sufficiently familiar with the events of December 16 to have been relied upon by counsel in making an authoritative submission of Source's position in a Court filing, was under the impression that the decision to remove the material was not taken immediately—and indeed, the links were not immediately removed on December 16.

Moreover, Source's effort to comply was decidedly haphazard. Aris's testimony is confused and confusing, though the Court does not believe that Aris intended to mislead.[9] Shady contends that the easiest and simplest way of removing. the songs from the website would be to take down the "content," that is, to remove the lyrics and recordings themselves from the server. Aris, however, undertook instead to leave

the material itself available on the server, but to make it inaccessible to the public by removing the "links" to that content on the website. (Aris Tr. 39.) Shady contends that Aris initially testified, under questioning by Shady's lawyer, that Mays had instructed him to proceed in that manner, and then, after coaching by Source's attorney (who represented Aris for purposes of the deposition), disavowed that testimony. (P. Summ.Br.8, 15–16.) The Court does not read the testimony as falling into such a clear pattern. Aris repeatedly testified that he removed both "content" and "links" from the site, and testified on direct questioning by Shady as well as in the brief questioning by Source's counsel that Mays had instructed him to remove all of the Eminem material from the site. (Aris Tr. 61, 24, 71.)[10]

As Shady argues, removing all of the links, of which there were many, seems intrinsically to have been a difficult and uncertain enterprise. Aris testified that there were "a hundred thousand" links, and that the complex nature of the website made it difficult to remove, or even to find, them all. (Aris Tr. 42.) Shady appears correct that this procedure was far from certain to remove the offending material from public access. On the other hand, Aris's testimony does not support the simplistic contention that the "content" could have been pulled with ease. While Shady

cated its actions as "fair use." At any rate, it is well established that even if the initial order was overbroad or subject to modification on appeal or reargument, the remedy of the party to whom the order is addressed is to seek such modification, not to violate the order. *See GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.,* 445 U.S. 375, 386, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980); *Walker v. City of Birmingham,* 388 U.S. 307, 317, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *In re Criminal Contempt Proceedings Against Gerald Crawford, Michael Warren,* 329 F.3d 131, 138 (2d Cir.2003).

9. Aris was deposed on February 23, 2004. By agreement of the parties, the deposition testimony was made part of the hearing record.

10. As for *when* that instruction was given, Aris's recollection was clearly uncertain, but it can fairly be said that his testimony does not contradict Mays's account that the instruction was given on or about December 16. (Tr. 49; Aris Tr. 24.)

draws the not unreasonable inference that the lyrics and recordings were electronically present at some single identifiable location, to which access was provided by multiple links or pathways, Aris testified that he did remove content as well as links, and he appears to have believed that the content as well as the links appeared at a number of places on the site, or in locations that would have been hard to remove without disrupting permissible content on the site. (Aris Tr. 45–46.) Neither side presented testimony with a sufficient degree of technological sophistication to ascertain exactly how the website was constructed and what specific procedures, if any, might have been more effective than those Aris employed.

Nor was Aris entirely clear about how it was determined that he would follow this procedure. Aris endorsed Mays's generalization that Mays instructed Aris to remove "all Eminem-related music and lyrics from the website at once." (Aris Tr. 24.) But he also testified that "I was just supposed to remove the links that were supposed to get you to the music or to the words," and that this was something Mays had "specif[ied]." (Id. 30.) His testimony was hopelessly confused as to whether Mays wanted (1) all the song lyrics and recordings removed, but journalistic material describing the controversy over the songs to stay in place (id. 30–31), or (2) some lyrics and music to remain on the server, but with the links that would permit public access removed (id. 32–33).

Ultimately, the strongest evidence supporting Shady's claim of willful contempt, and undermining Source's claim of diligent compliance, is the simplest. It is simple fact that the full text of the songs was publicly accessible on the website on January 6, 2004, some three weeks after it had been ordered removed. Moreover, there is strong evidence that the links had not simply remained on the site through inadvertent failure to remove them, but had reappeared there after having been removed. It is true, as Source argues, that neither Bloom nor any other witness had made a comprehensive survey of the website's content and structure as of December 23 or 24, making it impossible to conclude to a certainty that the links identified on January 6, particularly those described as "hidden" links, had not been there all along, unremoved during Aris's unsuccessful efforts and overlooked by Bloom in his occasional visits to the site in late December. But the printout of the screen observed by Bloom on January 6 reveals a banner headline proclaiming "Racial Eminem Track; World Unveiling of Never–Before–Heard Eminem Track . . .," followed by a large-print instruction to "Click Here for Lyrics." (PX 6, Bloom Aff. Ex. G.) As Bloom testified, this was exactly the structure of the page as of December 3, before the injunction. (Id. ¶¶ 3, 9 & Ex. A, G.) Moreover, the banner was changed on December 16, to remove the "Click Here for Lyrics" instruction. (Id. ¶ 5 & Ex. C.) The screens observed on December 16 (Id. Ex. C, D) differ in other respects from the December 3 and January 6 prints, and the possibility cannot be excluded that Bloom somehow identified a different portion of the website on December 16 than the one he had seen on December 3, which remained unaltered until January 6. The more reasonable inference, however, is that in monitoring Source's compliance on December 16, Bloom could not have overlooked such a prominent page on a site he had visited before.

Taken altogether, however, the evidence does not persuade the Court that Source deliberately decided to defy the Court's order or to leave or return forbidden material to public access on the website. It is a reasonable inference, and the Court so

finds by a preponderance of the evidence, that the banner link returned to the website sometime between December 16 and January 6, and this must have occurred through some human agency. At the same time, the degree of acrimony and lawyerly zeal in this litigation makes it inconceivable that Source was unaware that Shady would be vigorously monitoring its compliance with the order. Whatever Mays's precise instructions to Aris, neither witness retreated from the basic claim that Mays had ordered Aris to see to it that the public could not access the lyrics or recordings from the website, and their testimony on this point is credible. While someone at Source clearly undertook to restore at least some portions of the former website, the Court cannot conclude that Mays, or some other responsible Source official, made a conscious decision to violate the Court's orders, or that whoever returned the links to the website had notice of the order.

At the same time, Source's efforts to comply were slipshod and ineffectual. Mays's orders were sufficiently ambiguous that Aris was left with the apparent impression that some of the forbidden content should be left on the site, provided that an effort was made to remove all the links to that content. While in theory this could have led to sufficient compliance—as Aris testified, without the links the content was inaccessible (Aris.Tr.32, 38), and the order did not forbid Source to possess electronic copies of the material, but only to reproduce, distribute, or make them available—in practice Aris was well aware that the number of links on the site and his lack of knowledge of all their locations rendered it highly unlikely that the effort would succeed. Other Source employees, such as Washington, and Source's own lawyers, were left with the impression that compliance had not been required at all, at least during the first week after the

Court's order. In this atmosphere, it is hardly surprising that someone in the Source hierarchy would have either remained ignorant of the order or felt free to disregard it when making decisions about web content in early January.

More is required from a company that has been enjoined from violating a plaintiff's copyright and ordered to remove infringing material from its electronic publications. It was incumbent on the Source, and on Mays, not merely to instruct that the material be removed, and to engage in unspecified "follow[ ] up . . . just to make sure it was being done" (Tr. 49), but to ensure that all its employees understood the terms of the order and the importance of complying, and that all reasonable steps would be taken to prevent public dissemination of the material in the present and in the future. On this record, it is clear that Source did not adequately do so.

Accordingly, the Court finds that Source and Mays were in contempt of the Court's order on January 6, but that the violation was not willful.

### REMEDIES

■ The violation appears to have been short-lived. While it is not clear from the record when the links returned, it is unlikely that it was long before January 6, and the links were promptly removed once Shady's lawyers complained. As noted, moreover, the violation, while clearly culpable, was not willful on the part of Source's senior management. The question of remedy is thus squarely posed.

For the reasons stated above, the Court concludes that an award to Shady of the costs of enforcement, including reasonable attorneys' fees incurred in making the contempt motion, is appropriate. Willfulness may well be an appropriate criterion to be taken into account in awarding fees, espe-

cially when such fees will be added to compensation for tangible harms, or disgorgement of benefits, obtained by the complaining party. In such cases, it is reasonable to analogize the contempt proceeding to any other action for compensation for a defendant's wrongful conduct, and apply the usual American rule that a wronged party is entitled to compensation, but must bear the cost of righting the wrongs itself. In this case, however, the costs of enforcing compliance constitute the only measurable harm suffered by Shady. As the Eleventh Circuit has recognized, *see Sizzler*, 793 F.2d at 1535, to leave the plaintiff to bear its costs in such a situation would give the plaintiff no incentive to bring the contempt to the Court's attention.

Nor is this a case, as Source would have it, in which a plaintiff who has suffered no real harm seeks attorneys' fees for bringing a pointless motion to punish a violation that had already been corrected once it was brought to defendants' attention. (D.Summ.Br.1, 9–10.) First, the history of the case justified considerable skepticism on Shady's part about Source's willingness to comply with the Court's orders. Whatever else can be said about Source's compliance in the immediate aftermath of the Court's December 15 order, it did not take decisive action to comply or to assure Shady that it would do so. Second, once the contempt motion was brought, Source's litigation posture could only have deepened that skepticism. Rather than acknowledging that mistakes were made, Source filed a brief that proclaimed that Source had deliberately withheld initial compliance, and made transparently meritless arguments that what Shady's lawyers had seen with their own eyes was merely an illusion fostered by their own computers— when all along, Source's CEO himself knew and could have verified that Shady's accusation was in fact accurate. Shady

can hardly be blamed for taking an aggressive stance in response to such provocation.

Thus, even to the extent that Source's contempt was not willful, its failure to take adequate care to comply, its refusal to take responsibility for that failure, and its reckless assertion of litigation positions, ultimately abandoned, which required Shady to investigate vigorously the possibility that it was confronted with willful contempt, and to develop expert testimony to refute a defense theory that was finally abandoned only at the very last minute in the face of inconsistent testimony from Source's own CEO, all justify an award of attorneys' fees in this case.

Shady's further demand, however, for a fine of $15,000 per day for violation of the order (P. Br. 10–11; P. Summ. Br. 23) is not warranted. Such a sanction cannot be justified as necessary to coerce compliance (since there is no contention that Source has been out of compliance at any time since January 6), or as compensation for plaintiff (which suffered no uncompensated harm) or as disgorgement of the proceeds of Source's violation (since there were none). Absent such a justification, a fine could only function as a punishment. That is the function of criminal, not of civil, contempt. *See Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 631, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988), quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Shady has not sought a finding of criminal contempt; the procedures followed have been civil and not criminal in nature; and the facts in any event would not justify such a finding. Accordingly, no fine will be imposed.

## CONCLUSION

For the reasons stated, the Court finds the defendants Source Enterprises, Inc.,

and David Mays in civil contempt of its order of December 23, 2003, and awards the plaintiff as compensation the costs of enforcing the order, including court costs and reasonable attorneys' fees incurred in bringing and prosecuting the contempt motion. No further sanction will be imposed. Plaintiff is directed to submit an application appropriately documenting the amount of costs and fees demanded by June 25, 2004. Defendant may submit a response by July 2, 2004. Any reply by plaintiff must be submitted by July 9, 2004.

SO ORDERED.