FORD MOTOR COMPANY, Plaintiff,

v.

B & H SUPPLY, INC., a corporation; Minnesota Dealer Supply, Inc., d/b/a Accent Parts, International, a corporation; Dealer's Discount Supply II, Inc., a corporation; Minneapolis Warehouse Supply, Inc., d/b/a B & H Supply, a corporation; All-American Automotive, Inc., a corporation; Tri-City Distributing, a corporation; Mid-West Automotive Dealers Supply, Inc., a corporation; Autocraft Parts Supply, Inc., a corporation; Superior Plug, Inc., a corporation; Robert Hooper, an individual; Richard Jobe, an individual; Robert Mitchell, an individual; Mark Nelson, an individual; Phil Berdell, an individual; and Henry Bechthold, an individual, Defendants.

Civ. No. 3–85–865.

United States District Court,
D. Minnesota,
Third Division.

Oct. 28, 1986.

David C. Hilliard, and Charles R. Mandly, Jr., Pattishall, McAuliffe & Hoftstetter, Chicago, Ill., Warren Spannaus, Dorsey & Whitney, Minneapolis, Minn., and Clifford L. Sadler, Dearborn, Mich., for plaintiff Ford Motor Co.

Malin D. Greenberg, St. Louis Park, Minn. for defendants B & H Supply, Inc., Mid-West Automotive Dealers Supply, Inc., Superior Plug, Inc.

Robert Hooper, Phil Berdell, and Henry Bechthold, Timothy B. Poirier, Harrigan & Hanley, Minneapolis, Minn., for defendants Dealers' Discount Supply II, Inc., Minnesota Dealers Supply, Inc., Accent Parts Intern., Inc., Autocraft Parts Supply, Inc., and Richard Jobe.

James W. Hunter, Rapaport, Wylde & Hunter, Minneapolis, Minn., for defendants Minneapolis Warehouse Supply, Inc., All-American Automotive, Inc., Tri-City Distributing, Inc., Robert Mitchell, and Mark Nelson.

## INTRODUCTION

MAGNUSON, District Judge.

Plaintiff Ford Motor Company (Ford) commenced this action against the various defendants on June 26, 1984, alleging claims of copyright infringement (Count I), trademark infringement and unfair competition (Count II), and racketeering and corrupt practices (Count III). Contemporaneous with filing its Complaint, Ford sought a Temporary Restraining Order and an Order for Seizure. In an Order dated June 26, 1984, Judge Harry H. MacLaughlin issued a Temporary Restraining Order, restraining the several defendants from using Ford's copyrighted package designs and trademarks, or any counterfeit or imitation of such designs or trademarks, and from doing any other act likely to confuse, mislead, or deceive the public that defendants' products originate from Ford or are ap-

proved by Ford. In his Order of June 26, 1984, Judge MacLaughlin also authorized a seizure of merchandise at the warehousing facilities of defendants B & H Supply, Inc., 8050 Wallace Road, Eden Prairie, Minnesota and Dealer's Discount Supply II, Inc., 6008 Culligan Way, Minnetonka, Minnesota. Upon execution of the seizure order, the United States Marshal seized significant quantities of automotive products and packaging which Ford alleges are counterfeit or spurious copies of Ford copyrights and trademarks.

On July 13, 1984, after a hearing on the merits, Judge MacLaughlin ordered a Preliminary Injunction as to defendants Dealers Discount Supply II, Inc., Minnesota Dealer Supply, Inc., Accent Parts International, Inc., Autocraft Parts Supply, Inc., and Richard Jobe. On July 16, 1984, the court issued a Consent Order for Preliminary Injunction as to defendants B & H Supply, Inc., Minneapolis Warehouse Supply, Inc., All-American Automotive, Inc., Tri-City Distributing, and Robert Hooper.[1] All defendants subsequently filed their Answers in December 1984, entering a general denial to Ford's allegations and asserting the affirmative defenses of failure to state a claim and estoppel, laches, and waiver. Following the disqualification of Judge MacLaughlin on May 8, 1985, this court entertained Ford's Motion for Summary Judgment. In an Order dated August 10, 1985, the court denied Ford's summary judgment motion, finding that genuine issues of material fact existed with respect to each of Ford's claims for relief.

During the course of the litigation, Ford brought two separate motions for an Order to Show Cause why certain defendants should not be found in contempt of court for violations of the preliminary injunctions previously ordered by the court. Specifically, in a motion filed August 8, 1985, Ford alleged that defendants Dealer's Discount Supply II, Inc. and Richard Jobe sold counterfeit Ford automotive parts in violation of the Preliminary Injunction entered against such defendants on July 13, 1985. Similarly, in a motion filed November 22, 1985, Ford alleged that defendant Henry Bechthold and Northland Automotive Warehouse, Inc., a/k/a Mainline Automotive, sold counterfeit Ford automotive parts in violation of the Preliminary Injunction of July 16, 1985. The court withheld consideration of Ford's motions for an Order to Show Cause until such time as the case was tried on the merits.

This lawsuit came on for trial before Judge Paul A. Magnuson on December 17, 1985 and December 18, 1985, and was fully submitted to the court upon the completion of post-trial briefing on February 7, 1986. The court had jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1338(a) and (b) and 28 U.S.C. § 1331. The court heard and received evidence with respect to Ford's claims of copyright and trademark infringement, unfair competition, and racketeering and corrupt practices. The court, having considered the testimony and evidence received at trial and the arguments and briefs of counsel, now offers this Memorandum and Order which constitutes the findings of fact and conclusions of law of the court as required under Rule 52(a) of the Federal Rules of Civil Procedure.

STATEMENT OF FACTS [2]

1. The Parties

Ford Motor Company is engaged in the manufacture, advertising, and sale of a va-

---

**1.** The individual defendants Robert Mitchell, Mark Nelson, Phil Berdell, and Henry Bechthold were not named in the Consent Order of July 16, 1984, but were implicitly covered by the Preliminary Injunction insofar as they were agents or officers of the corporate defendants named or were acting in participation with such defendants. *See also* Stipulation of Facts between Ford and B & H Supply, Inc., Minneapolis Warehouse Supply, Inc., All-American Automotive, Inc., Tri-City Distributing, Mid-

West Automotive Dealers Supply, Inc., Superior Plug, Inc., Robert Hooper, Robert Mitchell, Mark Nelson, Phil Berdell, and Henry Bechthold, paragraph 15.

**2.** The factual discussion which follows is drawn from the trial testimony and other evidence received and the Findings of Fact to which the parties have stipulated and which have been filed.

riety of motor vehicles, communication equipment, and related products and services, including automotive replacement parts and accessories. As part of its automotive replacement parts business, Ford has developed a unique and distinctive printed speeding car packaging design in blue, black and white colors and in red, black and white colors for which it has received Certificates of Registration from the United States Copyright Office.[3] Since at least 1966, Ford has used its distinctive speeding car trade dress and distinctive Ford Numbering System, and its FORD, Ford Oval, and MOTORCRAFT trademarks to identify its automotive parts and accessories. Ford has registered its FORD and MOTORCRAFT trademarks with the United States Patent and Trademark Office and it is undisputed that the registrations are valid, giving Ford the exclusive right to use such marks.

Over the past ten years, Ford has sold over ten billion dollars ($10,000,000,000.00) worth of automotive replacement parts and accessories and has spent over one hundred thirty million dollars ($130,000,000.00) in promoting such automotive parts under its trademarks and copyrighted package designs. By virtue of Ford's long use of its FORD, Ford Oval, MOTORCRAFT, Ford Numbering System and the Ford speeding car design trademarks, such trademarks acquired a secondary meaning signifying Ford and its products prior to the alleged infringing acts of defendants at issue in this action. Ford now owns a most valuable goodwill which is symbolized by its FORD, Ford Oval, MOTORCRAFT, Ford Numbering System and Ford speeding car design trademarks. As a result, the use of Ford's trademarks substantially increases the salability of Ford's products.[4]

Ford, concerned about increasing reports of counterfeit parts and simulated Ford packaging,[5] launched an investigation to determine the sources of such parts. Ford's concerns stemmed not only from the resulting lost profits, but also from their findings that the actual parts were of lesser quality and did not meet Ford's quality standards. Through its investigation, Ford identified approximately one hundred and twenty (120) sources of counterfeit and simulated parts, twenty-seven (27) of which were from Minnesota. A further investigation in early 1984 led Ford to believe that the warehousing facilities of defendants B & H Supply, Inc. and Dealer's Discount Supply II, Inc. supplied counterfeit and simulated parts to customers on a national basis. Consequently, Ford commenced this lawsuit and initiated the court-ordered seizures which took place on June 26, 1984. Ford alleges that all of the defendants are engaged together in the business of purchasing, warehousing, marketing, selling, and distributing automotive replacement parts, including parts bearing counterfeits or simulations of Ford's copyrighted speeding car design and Ford trademarks. Ford contends that defendants' conduct has resulted in violations of the copyright laws, 17 U.S.C. § 101–914, the trademark laws, 15 U.S.C. §§ 1051–1127, the anti-racketeering laws, 18 U.S.C. §§ 1961–1968, and the Minnesota law of unfair competition.

Defendant B & H Supply, Inc. (B & H Supply), a Minnesota corporation, is engaged in the business of purchasing, warehousing, and shipping automotive parts. Beginning in March 1984 and continuing

---

**3.** Ford's blue packaging is used for FORD service parts and accessories, which are sold only to Ford and Lincoln-Mercury dealers. In contrast, the red packaging is used in conjunction with the MOTORCRAFT automotive parts, which are sold to dealers as well as to independent distributors and wholesalers. The red packaging, MOTORCRAFT parts, may ultimately become available to the consuming public.

**4.** In addition to the various trademarks mentioned above, Ford uses and promotes the word "Quality" in connection with the marketing and

sale of its products, including its automotive replacement parts.

**5.** Kenneth Myers, Product and Marketing Manager for the Ford Parts and Service Division, testified that "counterfeit" parts refers to parts and packaging bearing the exact Ford trademarks and trade dress. "Simulated" parts and packaging refers to products displaying similar trade dress and, in particular, a speeding car design.

through the present time, B & H Supply ships automotive parts exclusively for defendants Minneapolis Warehouse Supply, Inc. (Minneapolis Warehouse), All-American Automotive, Inc. (All-American), and Tri-City Distributing (Tri-City). Prior to March 1984, B & H Supply operated under the name of Dealer's Discount Supply, Inc. (Dealer's Discount I). During that period, Dealer's Discount I shipped automotive parts on behalf of defendant Dealer's Discount Supply II, Inc. in addition to Minneapolis Warehouse, All-American, and Tri-City. B & H Supply is solely owned by defendant Robert Hooper (Hooper), who also serves as the corporation's president.

Minneapolis Warehouse, All-American, and Tri-City are three distinct, though related, Minnesota corporations involved in the sale of automotive replacement parts and accessories. Each corporation sells automotive parts on a nation-wide basis through telephone marketing. The telephone solicitations are primarily directed to automobile dealerships. As previously mentioned, Minneapolis Warehouse, All-American, and Tri-City use the services of B & H Supply to supply and ship their customer orders. Defendants Robert Mitchell and Mark Nelson are officers and principal owners of each of the three corporations. Defendant Phil Berdell is an officer and owner of All-American.

Defendant Dealer's Discount Supply, II, Inc. (Dealer's Discount II) is a Minnesota corporation owned and operated by defendant Richard Jobe (Jobe). Presently, Dealer's Discount II is involved both in warehousing and shipping of automotive parts and in telephone solicitations and sales of automotive parts and accessories. Initially, however, Dealer's Discount II operated only as a seller of automotive parts through telephone solicitations and marketing. Jobe purchased Dealer's Discount II in 1979 pursuant to a five-year purchase agreement with defendants Robert Hooper and Henry Bechthold. Under the terms of that agreement, Dealer's Discount II purchased its merchandise from Dealer's Discount I and employed the shipping services of Dealer's Discount I for a period of five years. Following the five-year period, in March 1984, Dealer's Discount II discontinued its shipping arrangement with Dealer's Discount I and began to warehouse and ship automotive parts for its own sales department and for the other telephone marketing corporations owned by Jobe.

In addition to Dealer's Discount II, Jobe owns and controls defendants Minnesota Dealer Supply, Inc. (Minnesota Dealer), Autocraft Parts Supply, Inc. (Autocraft), and Accent Parts International, Inc. (Accent). Each of these corporations is engaged in the business of telephone marketing of automotive parts and accessories. As with Dealer's Discount II, prior to March 1984 these corporations used the purchasing, warehousing, and shipping services of Dealer's Discount I. Beginning in March 1984, however, Dealer's Discount II took control of the purchasing, warehousing, and shipping of the automotive parts sold by Minnesota Dealer, Autocraft, and Accent.

Defendant Henry Bechthold, along with Hooper, was an original co-owner of Dealer's Discount I and Dealer's Discount II. In March 1979, Bechthold sold his interest in Dealer's Discount II to Jobe pursuant to a five-year purchase agreement. Under the arrangement with Jobe, Bechthold received consulting fees and other compensation from Dealer's Discount II during the period from March 1979 to March 1984. In May or June 1979, Bechthold also sold his interest in Dealer's Discount I to Hooper. He subsequently moved to Michigan during the summer of 1979 and eventually relocated to North Dakota in early winter of 1981. While in North Dakota, Bechthold managed a car dealership and, for approximately the first three months of 1982, he worked for one of Hooper's companies as a telephone salesman. After returning to the Minneapolis area in 1984, Bechthold again became involved in the automotive parts business. Presently, Bechthold owns several corporations which are engaged in the automotive replacement part business. None of the corporations owned by Bechthold are named as defendants in this suit, although

Bechthold-owned Northland Automotive Warehouse, Inc. (Northland) is involved to the limited extent that Ford alleges Bechthold and Northland violated the court's Preliminary Injunction.

An examination of the history of the various defendants and the relationships among them is somewhat complicated, but nevertheless essential to a disposition of the underlying substantive issues. Sometime during the early 1970s, defendants Hooper and Bechthold organized a business under the name of Minneapolis Warehouse Supply, Inc. At that time, Minneapolis Warehouse was involved in sales and shipping of automotive replacement parts, albeit on a small scale. In 1976, defendant Mitchell became employed by Minneapolis Warehouse and worked as a telephone salesman for approximately two years. Then, in or about June 1978, Mitchell, together with defendant Nelson, purchased Minneapolis Warehouse from Hooper and Bechthold. Subsequently, Mitchell and Nelson expanded their business to include All-American and Tri-City. As previously noted, these three corporations are involved solely in telephone marketing of automotive parts. The warehousing and shipping functions for these corporations are carried out by B & H Supply, formerly Dealer's Discount I. In addition, the bookkeeper for B & H Supply handles the payroll functions for Minneapolis Warehouse, All-American, and Tri-City.

During the time they owned Minneapolis Warehouse, Hooper and Bechthold started up various other corporations which were also engaged in the automotive parts business. In 1978, Hooper and Bechthold incorporated Dealer's Discount Supply, Inc. (Dealer's Discount I) and hired Jobe as their manager. Jobe served as manager for several months and eventually purchased a related corporation, Dealer's Discount II, from Hooper and Bechthold in 1979. From 1979 to March 1984, Dealer's Discount I provided warehousing and shipping services for Jobe's Dealer's Discount II. In March 1984 the purchase agreement between Jobe and Hooper and Bechthold was completed and Jobe, through Dealer's Discount II, began providing warehousing and shipping services for the sales division of Dealer's Discount II and the other corporations formed by Jobe, Minnesota Dealer, Autocraft, and Accent. When Dealer's Discount II began warehousing and shipping its own automotive parts as of March 1984, Dealer's Discount I changed its corporate name to B & H Supply, Inc. to avoid confusion on the part of customers or suppliers. At that time, Dealer's Discount II essentially took over the warehousing facilities of Dealer's Discount I at 6008 Culligan Way, Minnetonka, Minnesota. B & H Supply vacated the premises and moved to their present location at 8050 Wallace Road, Eden Prairie, Minnesota. B & H Supply also transferred to Dealer's Discount II, in bulk, various automotive parts remaining in the warehouse. Approximately twenty-eight thousand dollars ($28,000.00) worth of the products transferred consisted of alleged counterfeit parts or simulated packaging at issue in this lawsuit.

Hooper and Bechthold also incorporated defendant Midwest Automotive Dealer Supply, Inc. (Midwest) during the late 1970's. According to the testimony of defendant Henry Bechthold, Midwest became defunct in approximately 1981 and has been dormant since that time.[6] In addition to their automotive parts business, Hooper and Bechthold formed a partnership named B & H Enterprises in the 1970's. B & H Enterprises, named after "Bechthold and Hooper", was involved in real estate holdings in the St. Cloud, Minnesota area. Bechthold sold his interest in B & H Enterprises to Hooper in November 1979.

---

6. Bechthold currently owns a corporation operating under the assumed name "Midwest Automotive". In addition, the testimony of Richard Jobe indicates that Bechthold was involved with a "Midwest Parts Department" while he was living in North Dakota. Bechthold's corporation, however, is apparently separate and distinct from the original Midwest Automotive Dealer Supply, Inc. named as a defendant.

As is readily apparent from the brief history outlined above, the various corporate defendants share a common source of origin dating back to the initial automotive parts business started by Hooper and Bechthold. Over the years, several distinct corporations have evolved and many of these corporations are presently in direct competition with one another. The court also recognizes, however, that the various defendants have nevertheless been closely associated with one another during the years at issue. From approximately 1979 to the present, Hooper and his warehousing business, B & H Supply, formerly Dealer's Discount I, relied upon the sales of Minneapolis Supply, All-American, and Tri-City. These telephone marketing corporations, in turn, depended upon the services of B & H Supply to warehouse and ship their customer orders. A similar relationship existed between B & H Supply, formerly Dealer's Discount I, and the Jobe corporations, Dealer's Discount II, Minnesota Dealer, Autocraft, and Accent, until March 1984.

### 2. The products in dispute

Pursuant to the court's Order of June 26, 1984, the United States Marshal seized significant quantities of automotive parts and packaging from the warehouse facilities of B & H Supply and Dealer's Discount II. The items seized included parts packaged in genuine Ford packaging and parts packaged in the alleged "simulated" Ford packaging, i.e. packaging resembling the Ford speeding car design or using other of Ford's trademarks. The products purporting to be genuine Ford parts were apparently purchased by Ford and forwarded to a Ford testing facility to determine whether such parts were genuine Ford parts or counterfeit parts.

At B & H Supply, the marshals seized over two thousand individual parts. While Ford retained and tested a number of genuine Ford parts, none of these parts were found to be counterfeit. The alleged "simulated" Ford parts which were seized consisted of a dozen or so different types of replacement parts, in approximately six or seven different styles of packaging.[7] Each style of packaging depicted a speeding car in blue, black, and white colors or red, black, and white colors.

In addition to the seizure of "simulated" Ford packages containing automotive parts, the marshals also uncovered and seized eight cartons of flat, unassembled packages. The flattened packages were found in a large, wooden storage cabinet within the warehouse facilities. The outside of at least one of the cartons bore the phrase "SIM FORD BOXES".[8] As with the other alleged "simulated" Ford packages, these flats depicted a speeding car design in blue, black, and white colors and red, black, and white colors. In addition, the flats contained a darkened oval with the word "Quality" printed inside the oval. Hooper denied ever using the specific packaging found in the cartons, and he even offered an explanation as to their origin.[9] While the court finds Hooper's testimony on this point suspect,[10] a determination on the question of whether he actually used that specific packaging is not necessary for the court's ultimate findings. The other packaging undisputedly sold by B & H Supply is sufficient by itself to support the court's determinations.

---

7. A representative sampling of the parts and packages seized at B & H Supply was admitted in evidence as Plaintiff's Exhibit Nos. (PX No.) 5A through 5Q.

8. Photographs showing the cartons of flat, unassembled packages were admitted in evidence as group exhibits, PX Nos. 8 and 9.

9. In his trial testimony, Hooper stated that possibly the cartons of flats were part of a purchase of inventory he made in or about 1978. That purchase involved the inventory of a company foreclosed on by Hooper's bank.

10. The packaging seized at B & H Supply included designs substantially similar, although not identical, to the design on the flat packages. *See* PX Nos. 5B, 5D, 5J, and 5K. *See also* PX No. 5Q (virtually identical). Moreover, parts and packaging seized at Dealer's Discount II included similar packaging bearing the speeding car design and the oval with the word "Quality" printed inside. *See* Nos. 4D, 4K, and 4M.

The court-ordered seizure at Dealer's Discount II resulted in the seizure of over seven thousand (7,000) automotive parts. Of the genuine Ford parts subsequently tested by Ford, thirty-five (35) were found to be counterfeit ignition modules. These modules contained internal circuitry which was inferior to that provided in genuine Ford modules.

Similar to the situation encountered at B & H Supply, the alleged "simulated" Ford parts and packaging seized at Dealer's Discount II included approximately six styles of packaging design,[11] with each style using a speeding car design in blue or red color schemes. Another packaging style used the word "MOTORCRAFT" in very prominent print.

The defendants do not dispute that Ford possesses valid copyrights and trademarks in its unique speeding car design, but rather dispute that the packaging which they have used infringes Ford's copyrights and trademarks. The trial testimony has established that the individual defendants are aware of and familiar with Ford's speeding car design as featured on its FORD and MOTORCRAFT packaging. In fact, each of the several defendants either sells or distributes Ford's MOTORCRAFT products.

Ford's packaging features a dark sports car, surrounded by horizontal lines giving the visual impression that the car is speeding forward. The horizontal lines also interrupt the actual drawing of the car so as to give the car a ghosted appearance.[12] Genuine FORD service parts are packaged in blue, black, and white colors, while MOTORCRAFT parts are packaged in red, black, and white colors. In addition to the speeding car design, genuine Ford packaging includes a darkened oval with "Ford" written on the inside.

Like Ford's packaging, the simulated packaging at issue in this case features a speeding car design. The styles of packaging seized at B & H Supply are similar to or the same as the styles seized at Dealer's Discount II. While each of the various styles features a speeding car, the styles differ from one another in minor respects. All of the styles depict a dark sports car surrounded by horizontal lines. As with Ford's design, the horizontal lines are streaked across the body of the car, making the car appear to be speeding forward. At least three of the simulated package designs feature speeding cars which are virtually indistinguishable from Ford's speeding car design. (*See* PX Nos. 4D, 4G, 4H, 4K and 5B, 5D, 5E, 5K, 5L, and 5Q).[13] The remaining styles feature slightly different speeding car designs, but are nevertheless similar in appearance to Ford's design. (*See* PX Nos. 4E, 4F, 4I, 4J and 5A, 5F, 5G, 5H and 5J).

## CLAIM OF COPYRIGHT INFRINGEMENT

### 1. Liability

■ In order to establish a claim of copyright infringement, plaintiff must prove (1) the existence, ownership, and validity of a copyright, and (2) defendants' violation of the owner's exclusive rights set forth in the Copyright Act, such as reproduction of the copyrighted work in copies or public distribution of copies. *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 433, 104 S.Ct. 774, 784, 78 L.Ed.2d 574 (1984). *See* 17 U.S.C. §§ 106(1) and (3) and 501(a). *See also* 3 *Nimmer on Copyright,* § 13.01. One of the exclusive rights specifically granted by the Copyright Act is the right "to distribute copies ... of the copyrighted work to the public by sale". 17 U.S.C. § 106(3); *Midway Mfg. Co. v. Dirkschneider,* 571 F.Supp. 282, 285 (D.Neb.1983).

---

**11.** A representative sampling of the parts and packages seized at Dealer's Discount II was admitted in evidence as PX Nos. 4A through 4M.

**12.** A representative sampling of Ford's speeding car design was admitted in evidence as PX Nos. 3C–3I.

**13.** The flattened packages seized at B & H Supply also depict a speeding car design which is likewise indistinguishable from Ford's design. *See* PX Nos. 5C, 5I, 5M, 5N, 5O, and 5P.

Ford has offered with respect to the existence, ownership, and validity of a copyright in its speeding car design United States Certificate of Copyright Registration Nos. K 81363 and Kk 201345. A certificate of registration constitutes prima facie evidence of the validity of the copyright and of the facts, including ownership and existence, stated in the certificates. 17 U.S.C. § 410(c); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980) (citing *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 n. 1 (2d Cir.1977). Defendants do not contest the validity or ownership of Ford's copyrights and, in fact, have stipulated that the copyrights are valid, conferring upon Ford exclusive rights and privileges in its package designs. The issue that all defendants contest is whether they are liable for infringement.

In order to prove defendants' violation of an exclusive right set forth in the Copyright Act, plaintiff must establish that defendants, or the person creating defendants' work,[14] had access to plaintiff's copyrighted work and that defendants' allegedly infringing work and plaintiff's copyrighted work are substantially similar. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir.1980). With respect to the question of access, the court finds that the defendants and any person creating defendants' packaging had access to Ford's copyrighted speeding car design. Ford has used the speeding car design on its FORD and MOTORCRAFT packaging since the late 1960's. Ford's products and their packaging have been widely disseminated over the years to those in the automotive business as well as the general consuming public. Moreover, the trial testimony established that, through their involvement in the automotive parts business, the individual defendants have seen and are familiar with Ford's design.

The court further finds that the designs featured on the defendants' various styles of packaging are substantially similar to Ford's speeding car design. As previously described by the court, some of the defendants' packaging styles depict speeding cars so strikingly similar to Ford's design that differences are difficult to detect. As to these styles, it is clear to the court that defendants' packaging copied virtually all aspects of Ford's speeding car design. A finding of infringement with respect to these styles of packaging is thus appropriate. *See Knickerbocker Toy Co., Inc. v. Genie Toys, Inc.*, 491 F.Supp. 526, 528–29 (E.D.Mo.1980).

Even those styles bearing slightly different speeding car designs satisfy the substantial similarity requirement. As the Eighth Circuit has stated:

The test of infringement is whether the work is recognizable by an ordinary observer as having been taken from the copyrighted source. Slight differences will not serve as a defense.

*Wihtol v. Crow*, 309 F.2d 777, 780 (8th Cir.1962). Because similarities rather than differences are considered under the applicable test, the presence of differences in defendants' packaging designs will not preclude a finding of infringement. *Animal Fair, Inc. v. Amfesco Industries, Inc.*, 620 F.Supp. 175, 188 (D.Minn.1985), *aff'd* 794 F.2d 678 (8th Cir.1986). The critical question for consideration is "whether the accused work has captured the 'total concept and feel' of the copyrighted work." *Animal Fair*, 620 F.Supp. at 188, citing *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

All of defendants' packaging styles feature a speeding car design. More specifically, each design depicts a dark car surrounded by horizontal lines signifying fast, forward movement. As with Ford's copyrighted styles, defendants' packaging employs the blue and red color schemes. Any differences between these styles of packaging and Ford's design are too insignificant to defeat a finding of infringement. A careful observation and comparison of the

---

**14.** *See* 3 *Nimmer on Copyright,* § 13.02.

packaging designs compels a finding that the ordinary observer would recognize that defendants' speeding car designs were taken from Ford's copyrighted design. *Wihtol v. Crow*, 309 F.2d at 780. The fact that pictures of automobiles may be common on the packaging of automotive parts does not change the result. Ford's distinctive speeding car design is undisputedly subject to copyright protection. The packaging used by the various defendants is so similar to Ford's copyrighted design as to negate a determination that it merely copies an automobile design within the public domain.

■ Having determined that the spurious packaging at issue infringes Ford's copyrights, the more critical question concerns which defendants, if any, are liable to Ford for copyright infringement. With respect to this issue, the court initially notes that during the trial of this case, the court entered a directed verdict in favor of defendant Superior Plug, Inc. (Superior Plug). Ford had introduced no evidence whatever that Superior Plug had sold or distributed any of the automotive parts or packaging at issue in this case. Moreover, Ford had failed to establish that Superior Plug had any connection to the various defendants' conduct which Ford has challenged.

■ Similarly, the court finds that Ford has failed to establish claims of copyright infringement against defendants Henry Bechthold and Midwest Automotive Dealers Supply, Inc. Defendant Bechthold sold

his interests in the automotive parts business by late 1979. He left the State of Minnesota for approximately five years, the crucial years at issue in this case. While Bechthold worked approximately three months for Hooper in 1982, the evidence is insufficient to establish liability for copyright infringement based on this three-month period. The court also rejects Ford's argument that Bechthold remained active in the business of Dealer's Discount II because of the payments he received from Jobe. Although Bechthold continued to receive payments from Jobe through early 1984, there is no evidence to establish his involvement with Dealer's Discount II during that time. In addition, the court cannot say that Bechthold is liable to Ford based upon his earlier involvement with Dealer's Discount I and Minneapolis Warehouse in late 1978 and 1979.

■ The evidence relating to defendant Midwest is likewise insufficient to establish liability for copyright infringement. The only evidence introduced as to this defendant indicates that Midwest became defunct as of 1981 and has remained inactive since that time.[15] The evidence of activity prior to that time is sketchy at best and insufficient for a finding of liability.[16]

■ In contrast, the evidence offered by Ford establishes that the remaining corporate defendants [17] marketed, sold, or distributed automotive parts in the packaging found to be infringing.[18] These defendants

---

**15.** As previously discussed, the court cannot say, on the evidence presented, that Bechthold's current business or the business he operated in North Dakota is the same entity as the Midwest Automotive Dealers Supply, Inc. named as a defendant.

**16.** The testimony of Henry Bechthold establishes that Midwest was incorporated by Hooper and Bechthold sometime in the late 1970's and became defunct in 1981. Other evidence indicates that defendant Mitchell became involved with Midwest at some point. *See* PX No. 10 (Mitchell's signature on behalf of Midwest in Consent Decree).

**17.** The remaining corporate defendants include B & H Supply, Minneapolis Warehouse, All-

American, Tri-City, Dealer's Discount II, Minnesota Dealer, Autocraft, and Accent.

**18.** The parties dispute the exact timing of defendant's sales of the infringing packaging. Ford contends that Dealer's Discount I shipped parts in the spurious packaging since 1978, relying on the deposition testimony of John C. Dunn. *See* Dunn deposition dated November 8, 1984, p. 8. In his deposition and trial testimony, defendant Robert Hooper denied that his company used such packaging in 1978, but indicated instead that Dealer's Discount I distributed such packaging as of late 1980 and 1981. Indeed, Ford introduced documents assembled by Hooper which account for the quantity of such products purchased beginning in December 1980. Because Ford's requested measure of damages dates back only to December 1980,

assert two primary defenses. First, all defendants assert, in one form or another, their innocent intent. For instance, B & H Supply, Hooper, Dealer's Discount II, and Jobe contend that they did not know the spurious packaging was a copy of Ford's copyrighted design, but rather believed that the various designs were dissimilar from Ford's design. Similarly, the telephone-marketing defendants, Minneapolis Warehouse, All-American, Tri-City, Minnesota Dealer, Autocraft, Accent, Mitchell, and Nelson, contend that they did not know what packaging their suppliers were using and, in any event, could not control the specifics of the packaging used.

■ The court rejects both arguments concerning the question of innocent intent. Intent is not an element of copyright infringement and, thus, absence of intent is not a valid defense to a claim of copyright infringement.[19] *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1044 n. 13 (D.C.Cir. 1981); *Wihtol v. Crow*, 309 F.2d at 780; *Johns & Johns Printing Co. v. Paull-Pioneer Music Corp.*, 102 F.2d 282, 283 (8th Cir.1939).

The defendants also seek to avoid liability by contending that they did not design, manufacture, or package the parts or packaging in question. By this argument, defendants assert that if anyone copied Ford's speeding car design it was not any of the defendants involved in this case. Defendants' argument on this point totally ignores that Ford's claim of copyright infringement is based upon their exclusive right to distribute copies of their speeding car design to the public by sale. 17 U.S.C. § 106(3); *Midway Mfg. Co. v. Dirkschneider*, 571 F.Supp. at 285–86.

■ All of the corporate defendants sell or distribute the infringing packaging. The various telephone-marketing defendants do the actual selling of the automotive parts to the customer-dealers. The warehousing defendants then ship the parts according to the customers' orders. Each of the corporate defendants is therefore an essential element in the chain of distribution and as such is jointly and severally liable for the copyright infringement. *Costello Publishing Co. v. Rotelle*, 670 F.2d at 1043. This liability is predicated upon the primary liability of each of the corporate defendants for their distribution of the infringing packaging, rather than on the contributory or vicarious liability of such defendants.

■ The court next addresses the personal liability of the individual defendants. A corporate officer who has the ability to supervise the infringing activity and has a financial interest in that activity, or who personally participates in that activity is jointly and severally liable with his corporation for the infringement. *Gershwin Publishing Corporation v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1161–62 (2d Cir.1971); *Southern Bell Telephone and Telegraph Company v. Associated Telephone Directory Publishers*, 756 F.2d 801, 811 (11th Cir.1985); *Warner Bros., Inc. v. Lobster Pot, Inc.*, 582 F.Supp. 478, 482 (N.D.Ohio 1984); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F.Supp. 900, 904 (S.D.N.Y.1981). Such liability attaches even if the individuals are ignorant of the infringement. *Gershwin Publishing Corporation v. Columbia Artists Management, Inc.*, 443 F.2d at 1162; *Southern Bell Telephone and Telegraph Company v. Associated Telephone Directory Publishers*, 756 F.2d at 811.

■ Defendant Hooper is the sole shareholder of B & H Supply and also serves at the corporation's president. He undoubtedly has a direct financial interest in the sales of the infringing goods by B & H Supply, even if the spurious parts and packaging constituted only a fraction of

---

based on Hooper's documents, the court need not make a determination on whether the sales began in 1978.

**19.** While intent is not an element of copyright infringement, intent is relevant in the consideration of appropriate remedies. *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1044 n. 13 (D.C.Cir.1981).

the total sales.[20] As president and sole shareholder, Hooper also possesses the ability to supervise the activities of B & H Supply. More importantly, Hooper is actively involved in the sales of the infringing packaging and in fact orders all the merchandise for his warehousing business. Hooper is therefore personally liable for the infringing activity of B & H Supply.

Defendant Jobe is president and sole owner of Dealer's Discount II. In this position, Jobe is actively involved in the warehousing business and does the actual ordering of automotive parts. Jobe also owns a controlling interest in Minnesota Dealer, Autocraft, and Accent and acts as a corporate officer in each of these corporations. While these latter three telemarketing companies are managed by another individual, Jobe oversees the business of all three.

Based upon his position in the various corporations, the court finds that Jobe has the ability to supervise the sales and shipping of parts in the infringing packaging. Moreover, as sole shareholder and controlling shareholder, Jobe had requisite financial interest in the infringing activity. In so concluding, the court rejects Jobe's argument that prior to March 1984, he had no control over the parts and packaging shipped by Dealer's Discount I. The fact that Jobe was contractually obligated to purchase his merchandise from Dealer's Discount I until March 1984 does not negate Jobe's responsibility as a controlling shareholder and corporate officer. Jobe is thus personally liable for the infringing activity of Dealer's Discount II, Minnesota Dealer, Autocraft, and Accent.

For similar reasons, the court finds that defendants Nelson and Mitchell are personally liable for the infringing activity of Minneapolis Warehouse, All-American, and Tri-City. Nelson and Mitchell are the principal shareholders and corporate officers of all three corporations. Nelson serves as president of Tri-City and vice-president of Minneapolis Warehouse and All-American, and Mitchell serves as president of Minneapolis Warehouse and All-American. Additionally, these defendants are actively involved in the daily operations of their businesses. By virtue of the corporate positions and ownership interests, Nelson and Mitchell have the right and ability to supervise the sales and distribution of the infringing products. As such, they may be held personally liable even though they had no knowledge of the infringing nature of the parts and packaging they sold. *Southern Bell Telephone and Telegraph Company v. Associated Telephone Directory Publishers*, 756 F.2d at 811; *Warner Bros., Inc. v. Lobster Pot, Inc.*, 582 F.Supp. at 483. These defendants also have a direct financial interest in the infringing sales, albeit the sales of the infringing products may be but a small percentage of their total sales.

The court, however, concludes that Ford has failed to establish personal liability on the part of defendant Phil Berdell. Berdell is a minority shareholder in All American and acts as treasurer of that corporation. Without more compelling evidence of Berdell's ability to supervise the activities of that corporation, the court is not willing to impose liability.

To briefly summarize, the court finds that the parts and packaging at issue infringe the copyrights of Ford and that the following defendants are jointly and severally liable for that infringement: B & H Supply, Robert Hooper, Dealer's Discount II, Minnesota Dealers, Autocraft, Accent, Richard Jobe, Minneapolis Warehouse, All-American, Tri-City, Mark Nelson, and Robert Mitchell.

### 2. Remedies

Ford first seeks relief in the form of a permanent injunction. Section 502(a) of the Copyright Act provides that the court "may ... grant temporary and final

---

**20.** According to the testimony of Robert Hooper, the purchases of the spurious packaging in question represented approximately 1-1/2% of the total purchases for the period from February 1982 through May 1984.

injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). As a general rule, a copyright plaintiff is entitled to a permanent injunction when liability is established and there is a threat of future violations. *Pacific and Southern Company, Inc. v. Duncan,* 744 F.2d 1490, 1499 (11th Cir.1984), *rehearing denied* 749 F.2d 733 (11th Cir.1984), *cert. denied* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985); 3 *Nimmer on Copyright,* § 14.07[B].

■ After reviewing the entire record in this matter, the court is convinced that a permanent injunction is appropriate under the circumstances. The court specifically finds that Ford has established a substantial likelihood of future violations by the various defendants if they are not enjoined. In this regard, the court notes that certain of the defendants have been subject to an injunction with respect to simulated General Motors parts and packaging. The court acknowledges that the defendants have substantially complied with the court's preliminary injunction and have changed the packaging of certain automotive goods. The court nevertheless believes that a permanent injunction is appropriate given the history of defendants' dealing with the infringing parts. Furthermore, the court recognizes that some defendants have sold counterfeit Ford parts even in the face of the preliminary injunction.

■ Ford also seeks forfeiture and destruction of the counterfeit and spurious merchandise found to infringe Ford's copyrights pursuant to 17 U.S.C. § 503(b). Section 503(b) provides that "the court may order the destruction or other reasonable disposition of all copies ... found to have been made or used in violation of the copyright owner's exclusive rights." Under the circumstances, the court in its discretion finds it appropriate to require defendants to deliver to Ford all counterfeit or spurious automotive parts and packaging, in their possession or within their control, found by this court to infringe Ford's copyrights. Ford may take possession and control of such automotive parts and packaging, together with the counterfeit parts and packaging previously seized by the marshals, and dispose of all such material as Ford deems appropriate.

■ Ford's primary claim for relief is for recovery of its actual damages and any additional profits of the infringers under 17 U.S.C. § 504(a)(1). Specifically, Ford seeks actual damages measured by the profits Ford would have made from the sales of its packaged parts bearing the copyrighted designs, but for the defendants' sales of infringing parts and packaging. In other words, Ford seeks recovery of the actual economic profit Ford would have made if the sales lost to the defendants had instead been made by Ford.

Thomas Rackley, supervisor of pricing within Ford's controller's office, testified with respect to Ford's calculations of lost profits. Rackley prepared a summary of the sales and gross profits of the various automotive parts involved in this litigation and testified according to that summary.[21] The summary includes the number of individual automotive parts purchased by the defendants from December 1980 through June 1984.[22] Using these unit numbers, Rackley applied the prices charged by Ford to arrive at gross revenues for each automotive part. From the revenues, Rackley deducted the material costs for the parts to calculate the gross profits. Finally, Rackley deducted variable costs related to the sale of the various parts to arrive at the final figure of four hundred and four thousand and three hundred dollars ($404,300.00), for Ford's economic profit on such parts. From this figure, Ford subtracted approximately seventh-three thousand dollars ($73,000.00), representing the amount of economic profit of the parts previously

---

**21.** See PX No. 35.

**22.** The number of units was derived from purchasing documents and records supplied by the defendants.

seized by the United States Marshal.[23] Based on these figures Ford seeks actual damages in the amount of three hundred thirty-one thousand, and three hundred dollars ($331,300.00) for the economic profit it lost due to the defendants' sales of infringing automotive parts.

The figures used by Rackley are estimates based upon Ford's Product Line Profitability Analysis (PLPA). Ford prepares the PLPA annually to determine the performance and profitability of Ford automotive parts by product line. The variable costs considered in the PLPA include freight, handling, warranty, and trade discounts and promotional costs.

Defendants challenge Ford's claim for monetary damages on two principal grounds. First, defendants contend that Ford cannot prove its claim of damages with the requisite specificity because Ford cannot establish that it would have made the calculated sales but for defendants' infringing activity. The court rejects defendants' argument on this point and finds that Ford has satisfied its burden of proof. The court is convinced that Ford would have realized profits on the number of infringing parts and packaging sold by defendants. With respect to this issue, the court notes that courts necessarily engage in some degree of speculation in establishing lost sales due to sales of an infringing product. *See Stevens Linen Associates, Inc. v. Mastercraft Corp.,* 656 F.2d 11, 14 (2d Cir.1981).

Second, defendants offered the testimony of Henry Bechthold to challenge Ford's damage calculations. Bechthold's testimony asserted that Ford's calculations were unreasonably high and did not account for the various discounts offered automotive warehouses and dealers. This argument is without merit and is directly refuted by the testimony of Mr. Rackley and the information contained in the PLPA.[24]

Based upon the above analysis and evidence introduced at trial, the court concludes that Ford is entitled to recover its actual damages in the amount of $331,-300.00. Because this amount includes only Ford's actual damages and not defendants' profits, the defendants previously determined to be liable for the copyright infringement are jointly and severally liable for the full amount. *Compare Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 472 (2d Cir.1985).

■ In addition to its claim for actual damages, Ford seeks to recover its reasonable attorneys fees and costs under 17 U.S.C. § 505. Under § 505, the award of costs and attorneys' fees lies within the sound discretion of the court. Because § 505 is intended in part to encourage the assertion of colorable copyright claims and to deter infringement, fees are generally awarded to prevailing plaintiffs. *Diamond v. Am-Law Publishing Corp.,* 745 F.2d 142, 148 (2d Cir.1984.) Considerations which justify the denial of fees, however, include (1) the presence of a complex or novel issue of law that the defendants litigate vigorously and in good faith; (2) the defendants' status as innocent infringers; (3) the plaintiff's prosecution of the action in bad faith; and (4) the defendants' good faith attempt to avoid infringement. *Boz Scaggs Music v. KND Corp.,* 491 F.Supp. 908, 915 (D.Conn.1980).

■ None of the above justifications is present in this case, at least with respect to certain defendants. The case presented no complex issues of law. The only disputed issue concerned the element of infringement, and defendants' defenses with respect to this issue were summarily dismissed. Furthermore, the court rejects defendants' contentions of innocent infringement and finds that certain of the defend-

23. PX No. 35 does not include the $73,000.00 figure which represents the economic profit on the parts seized. Ford later corrected this oversight in its post-trial brief.

24. The use of Ford's PLPA to arrive at actual damages and economic profit was implicitly approved by the Eighth Circuit in *Ford Motor Company v. Auto Supply Co., Inc.,* 661 F.2d 1171 (8th Cir.1981).

ants engaged in willful copyright infringement.

Defendant Hooper was undeniably aware of Ford's speeding car design since the mid–1970's when he became involved in the automotive parts business. Through his warehousing business, he nevertheless sold automotive replacement parts, since at least late 1980, in packaging which features a substantially similar speeding car design. As previously noted, certain of the designs are almost indistinguishable from Ford's copyrighted design. Interestingly enough, these replacement parts are geared toward replacing original Ford parts. Of special significance is Hooper's previous involvement in a similar lawsuit, wherein General Motors alleged that Dealer's Discount I used trade dress confusingly similar to the marks of General Motors. Hooper, on behalf of Dealer's Discount I, signed a Consent Judgment, permanently enjoining Dealer's Discount I from using a confusingly similar trade dress. Based on this previous experience, Hooper cannot claim his innocence as to the packaging at issue, especially when the designs are so remarkably similar.

The court makes similar conclusions with respect to defendant Jobe and his corporations. As with Hooper, Jobe was fully aware of Ford's speeding car design. He also was familiar with the packaging used by his companies for the replacement parts in dispute. While he was not named as a defendant in the General Motors suit, Jobe was further aware of the previous injunction against Hooper and his corporations. On the basis of these facts and the evidence received at trial, the court finds that defendant Jobe and the corporations he controls, Dealer's Discount II, Minnesota Dealer, Autocraft, and Accent, engaged willfully in copyright infringement.

In contrast to the above findings, the court concludes that Ford has failed in its proof of willful infringement against defendants Nelson, Mitchell, Minneapolis Warehouse, All-American, and Tri-City. Although Nelson and Mitchell may have been familiar with Ford's speeding car design, the evidence does not establish that they knew of the designs and styling of the packaging used for the automotive parts they sold. Because they were not actively involved with the warehousing and shipping aspects of their supplier, B & H Supply, may reasonably not know the packaging styles of many of products. Moreover, the evidence does not establish that they sold the infringing automotive parts under the deliberate guise of genuine Ford products.

Having found willful copyright infringement on the part of Hooper, B & H Supply, Jobe, Dealer's Discount II, Minnesota Dealer, Autocraft, and Accent, the court in its discretion concludes that Ford is entitled to recover its reasonable attorneys' fees and costs from these defendants. *Lauratex Textile Corp. v. Allton Knitting Mills, Inc.*, 517 F.Supp. 900, 904 (S.D.N.Y.1981); *Broadcast Music, Inc. v. Niro's Palace, Inc.*, 619 F.Supp. 958, 963–64 (N.D.Ill.1985). Documentation of such reasonable attorneys' fees and costs should be submitted to the court within 30 days of the date of this order, at which time the court will review the request for attorneys' fees in more detail.

## CLAIM OF TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

### 1. Liability

In addition to its claim of copyright infringement, Ford asserts claims of trademark infringement and unfair competition under 15 U.S.C. § 1114(1) (§ 32(1) of the Lanham Act), 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act), and the law of Minnesota. In order to establish a claim of trademark infringement under § 32(1) of the Lanham Act, Ford must demonstrate that defendants so used or imitated a registered trademark as to likely cause confusion, mistake, or deception. *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1329 (8th Cir.1984); *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1090–91 (8th Cir.1980). *See* 15 U.S.C. § 1114(1). "The essential question in any case of alleged trademark infringement is whether purchasers are likely to be misled or confused as to the source of the differ-

ent products or services." *WSM, Inc. v. Hilton,* 724 F.2d at 1329 (8th Cir.1984). Answering this question requires the court to consider a number of factors to determine whether, under all the circumstances, a likelihood of confusion exists. These factors include the strength of plaintiff's mark, the similarity of plaintiff's mark and defendant's mark, the similarity of plaintiff's product and defendant's product, the degree of care that purchasers of the product likely exercise, the intent of defendant, and the existence of actual confusion. *Id; Squirtco v. Seven-Up Co.,* 628 F.2d at 1091 (8th Cir.1980).

In order to establish a claim of unfair competition under § 43(a) of the Lanham Act, Ford must prove that the trade dress of the two competing products is confusingly similar, that the appropriated features of the trade dress are primarily non-functional, and that the trade dress has obtained secondary meaning. *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1216–21 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). *See* 15 U.S.C. § 1125(a). The key to finding a violation under § 43(a) is a determination that defendants' products created a likelihood of confusion, deception or mistake on the part of the consuming public. *Toro Company v. R & R Products Co.,* 787 F.2d 1208, 1214 (8th Cir.1986); *Metric & Multistandard Components v. Metric's, Inc.,* 635 F.2d 710, 714 (8th Cir.1980).

Likelihood of confusion is similarly the touchstone requirement for a claim of trademark infringement and unfair competition under Minnesota law. *See Minneapple Co. v. Normandin,* 338 N.W.2d 18, 22 (Minn.1983). As such, the state claims will be considered in conjunction with the federal claims and will rise or fall with the federal claims.

With respect to its claim for trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), Ford introduced several registration certificates for its FORD and MOTORCRAFT trademarks.[25] Registration of a trademark by the Patent and Trademark Office is "prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark." 15 U.S.C. § 1057(b). Defendants do not contest the validity of Ford's trademarks and have stipulated that Ford possesses the exclusive right to use the FORD and MOTORCRAFT trademarks.

Because § 32(1) confers protection to registered trademarks, this statutory protection applies only to the FORD and MOTORCRAFT trademarks and defendants' use of such marks. The evidence as it relates to the FORD and MOTORCRAFT trademarks shows only limited instances of defendants' use of such trademarks. The primary use by defendants of the MOTORCRAFT trademark is in connection with the parts found to be counterfeits of genuine Ford parts. Approximately 35 such parts were seized from Dealer's Discount II in June 1984, in addition to the counterfeit Ford parts traced to Dealer's Discount II and Bechthold in 1985.

It is clear that, as to these counterfeit items, Ford has established the requisite likelihood of confusion. Ford has used its FORD and MOTORCRAFT trademarks in connection with its automotive parts since the 1960's and has expended large sums of money to promote the parts under those trademarks. As stipulated, those trademarks have acquired secondary meaning signifying Ford. Dealer's Discount II sold automotive parts in packaging identical to Ford's and bearing the MOTORCRAFT trademark. Such parts were sold to dealers as genuine Ford parts. According to the testimony of John Deprez, engineer with Ford's Parts and Service Division, some of the counterfeit parts traced to Dealer's Discount II and Bechthold were returned to Ford. Mr. Deprez also testified as to other instances of actual confusion by dealers.

25. *See* PX Nos. 2A through 2R.

While Ford has established trademark infringement on the part of Dealer's Discount II and Bechthold, it has introduced insufficient evidence as to the amount of damage suffered by such infringement. Undoubtedly, Ford has suffered some damage as it has lost a sale on each counterfeit part sold as a genuine Ford part. Furthermore, Ford has demonstrated that the counterfeit parts were of an inferior quality, thereby jeopardizing the goodwill and reputation of Ford. The exact amount of damage suffered by Ford as a result of the lost sales and threatened reputation, however, is not borne out by the record for purposes of the trademark infringement claim under § 32(1) of the Lanham Act.

Ford's more significant claim arises under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for unfair competition.[26] The defendants do not contest that the Ford oval, the Ford Numbering System, and Ford's speeding car design are non-functional features. Ford's distinctive trade dress and distinctive numbering system are primarily related to the identification of the automotive parts with Ford, rather than to the usefulness of the parts. These features are therefore non-functional and entitled to protection if they have acquired secondary meaning. *See Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d at 1217. *See also Animal Fair, Inc. v. Amfesco Industries, Inc.*, 620 F.Supp. at 189–90. Secondary meaning has also been established, as the parties have stipulated that the Ford Oval, the Ford Numbering System, and Ford's speeding car design have acquired secondary meaning signifying Ford and its automotive products.[27] Conse-

quently, the only element seriously disputed under § 43(a) is whether the packaging used by the various defendants creates a likelihood of confusion among prospective purchasers.

In determining whether the spurious packaging used by defendants is likely to cause confusion, the court considers several factors: (1) the similarity between Ford's trade dress and numbering system and the packaging and numbering system used by the various defendants' (2) the nature of the products involved; (3) the intention of the defendants in using a particular trade dress and numbering system for their automotive parts; (4) the degree of care likely to be exercised by a purchaser of the products; (5) the extent to which the two products compete in a similar market; and (6) the existence of actual confusion. *WSM, Inc. v. Hilton*, 724 F.2d at 1329; *Scott v. Mego International, Inc.*, 519 F.Supp. 1118, 1128–29 (D.Minn.1981).

As previously described by the court, the automotive parts and packaging at issue in this case are substantially similar to Ford's trade dress. In some instances, the speeding car designs featured on defendants' packaging are virtually indistinguishable from Ford's design. With other styles, the speeding car designs are slightly different, but nevertheless substantially similar. In addition, the defendants identify their automotive replacement parts by utilizing the Ford Numbering System. The only difference between the numbering systems is that defendants often include an "R" in their designation, following the Ford number.

---

**26.** Section 43(a) of the Lanham Act provides in relevant part:

Any person who shall ... use in connection with any goods or services, or any container or containers for goods, a false designation or origin, or any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

**27.** In their post-trial briefs, certain defendants contend that the using of Ford's numbering system cannot result in infringement or unfair competition. The court rejects this argument. A numbering system used to describe a plaintiff's product is entitled to protection under § 43(a) of the Lanham Act if the numbering system has acquired secondary meaning. *Williams v. Curtiss-Wright Corp.*, 691 F.2d 168, 172 (3d Cir.1982); *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 865 (7th Cir.1983).

The trade dress and numbering systems of both Ford and the defendants relate to the packaging and identification of automotive replacement parts. Moreover, the automotive replacement parts marketed and sold by the various defendants are in direct competition with the automotive replacement parts sold by Ford. All such automotive parts are sold on a national basis to automobile dealerships and ultimately to the consuming public for use in Ford and Lincoln-Mercury vehicles.

■ While intent is not a necessary element of an unfair competition claim, it is a relevant factor to consider in determining likelihood of confusion. *Scott v. Mego International, Inc.*, 519 F.Supp. at 1134. Specifically, a showing of intent on the part of defendants to pass off goods as the product of another raises an inference of likelihood of confusion. *Squirtco v. The Seven-Up Co.*, 628 F.2d at 1091. All defendants deny that they passed their products off as genuine Ford replacement parts, claiming instead that the products would be successful even in the absence of the spurious packaging. The evidence, however, indicates otherwise, at least with respect to certain defendants.[28]

Defendants Hooper and Jobe were familiar with Ford's trade dress and Ford's numbering system. In directly competing with genuine Ford products in the automotive replacement parts business, they nevertheless elected to sell and distribute parts in substantially similar packaging. In addition, they identified their parts using the Ford Numbering System. Although there is no direct evidence on the subjective intent of defendants, the evidence presented leads this court to conclude that Hooper, Jobe, and their corporations intended to trade upon the goodwill and reputation of Ford.

■ The defendants' principal argument on the issue of likelihood of confusion concerns the sophistication of the purchasers—here, the dealerships. In this regard, the defendants contend that the individuals ordering the replacement parts on behalf of the dealerships are experienced and not likely to be confused. Admittedly, the sophistication of buyers is an important factor for the court to consider, but it is not determinative on the question of likelihood of confusion.

> [T]he mere fact that the buyers may be discriminating technicians does not in and of itself insure against the likelihood of confusion. If the similarity between the marks is too great, the skill of the buyer will not necessarily preclude confusion.

*Hydril Co. v. Blowout Prevention, Inc.*, 221 U.S.P.Q. 1153, 1158 (W.D.Okla.1983) [Available on WESTLAW, DCTU database], *citing Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 462 (3rd Cir.1968).

Even assuming that the individuals purchasing the parts on behalf of the dealerships are experienced, the similarity of the trade dress and numbering systems at issue is sufficient to support a likelihood of confusion.

■ In any event, the court is persuaded by Ford's evidence to the effect that the sophistication of the dealers varies significantly, with some purchases being relatively unsophisticated. In fact, the evidence of Ford establishes that certain of the purchasers were actually confused. A showing of actual confusion is highly probative to a finding of likelihood of confusion. *See Squirtco v. Seven-Up Co.*, 658 F.2d at 1091. Moreover, some of the automotive parts marketed and distributed by the defendants ultimately reach the consuming public, who would not exercise a

---

**28.** Consistent with the court's reluctance to find willful copyright infringement on the part of Minneapolis Warehouse, All-American, Tri-City, Mitchell, and Nelson, the court cannot conclusively find that these defendants intentionally marketed and sold their spurious parts as genuine Ford parts. This conclusion, however, does not necessarily negate a finding of likelihood of confusion. Similarly, the absence of wrongful intent on the part of these defendants does not preclude their liability for unfair competition, since intent is not a necessary element of the claim.

great deal of care when purchasing automotive parts.

After careful consideration of the relevant factors and based upon the above analysis, the court finds that the packaging used by the various defendants creates a likelihood of confusion among prospective purchasers. Having established the requisite elements of a claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Ford is entitled to recover from those defendants who used the confusingly similar trade dress and numbering system in connection with the sale and distribution of the automotive parts at issue: B & H Supply, Dealer's Discount II, Minnesota Dealer, Autocraft, Accent, Minneapolis Warehouse, All-American, and Tri-City. Consistent with the court's ruling on the copyright infringement claim and under the same analysis, the court finds that Ford has failed to establish liability for trademark infringement or unfair competition on the part of defendants Bechthold and Midwest.

■ In addition to the liability of the various corporate defendants, the court concludes that the individual officers and principal shareholders are personally liable for damages suffered by Ford. As previously detailed by the court, Hooper, Jobe, Nelson, and Mitchell [29] owned, controlled, and actively participated in the business of their respective corporations. These individual defendants may thus be held personally liable for the claims of trademark infringement and unfair competition. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3rd Cir.1978); *Polo Fashions, Inc. v. Gordon Group*, 627 F.Supp. 878, 890 (D.N.C. 1985).

■ The test for liability under Minnesota law for unfair competition is also one of likelihood of confusion. The court's finding of likelihood of confusion in relation to the § 43(a) claim similarly supports a finding of liability against the various defendants on the state claim for unfair competition. These defendants, including

B & H Supply, Robert Hooper, Dealer's Discount II, Minnesota Dealer, Autocraft, Accent, Richard Jobe, Minneapolis Warehouse, All-American, and Tri-City, are jointly and severally liable for the claims of unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and state law. *See Smithkline Beckman Corp. v. Pennex Products Co., Inc.*, 103 F.R.D. 539, 540 (E.D.Pa.1984).

### 2. Remedies

■ Under the Lanham Act, Ford is entitled to permanent injunctive relief once it has demonstrated a likelihood of confusion, as it has here. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3rd Cir. 1983). *See also Metric & Multistandard Components v. Metric's, Inc.*, 635 F.2d at 714–15; *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160 (1st Cir. 1977). Ford is further entitled to an order for the forfeiture and destruction of all spurious packaging and counterfeit parts found to violate Ford's protected marks. 15 U.S.C. § 1118; *Playboy Enterprises, Inc. v. P.K. Sorren Export Co.*, 546 F.Supp. 987, 997 (S.D.Fla.1982). As previously ordered in connection with the claims of copyright infringement, defendants shall deliver to Ford all counterfeit parts and spurious packaging, in their possession or within their control, found by this court to infringe Ford's registered FORD or MOTORCRAFT trademarks and Ford's unregistered marks in violation of §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). Ford may take possession and control of such automotive parts and packaging, together with the counterfeit parts and spurious packaging previously seized by the marshals, and dispose of all such material as Ford deems appropriate.

Ford also seeks to recover monetary damages for its actual loss of profits, treble damages, and its reasonable attorney's

---

**29.** As before, the court refuses to impose personal liability on the part of defendant Berdell

in the absence of more compelling facts.

fees. Section 35 of the Lanham Act, 15 U.S.C. § 1117, sets forth the specific monetary remedies available to Ford on its claims of trademark infringement and unfair competition. *Metric & Multistandard Components v. Metric's Inc.*, 635 F.2d at 715. Under that section, Ford may recover (1) profits acquired by defendants; (2) damages sustained by plaintiff; and (3) costs of the action. 15 U.S.C. § 1117. In addition, § 35 gives the trial court discretion to award attorney's fees in exceptional cases and to increase the damages up to three times those found as actual damages.[30] 15 U.S.C. § 1117; *Metric & Multistandard Components v. Metric's Inc.*, 635 F.2d at 715. Under this section, the district court is given a great deal of discretion in fashioning the appropriate monetary remedy necessary to serve the interests of justice. *Id.*

■ Under the analysis of Ford's copyright infringement claim, the court has already determined that Ford has in fact suffered actual damages by the defendants' infringing activity. The court has also determined that Ford is entitled to recover its actual damages in the amount of $331,300.00, based upon its evidence as to lost profits. These findings are equally applicable to Ford's claims under the Lanham Act, especially in light of Ford's evidence as to actual confusion.

■ . Similarly, the court adopts its previous findings that defendants B & H Supply, Hooper, Dealer's Discount II, Minnesota Dealer, Autocraft, Accent, and Jobe willfully and intentionally engaged in the infringing activity. These defendants knowingly marketed, sold, and distributed automotive replacement parts in packaging which features speeding car designs almost indistinguishable from Ford's design and which bears the same descriptive part number. As in the case of willful copyright infringement, this finding of willfulness is sufficient to constitute an "exceptional" case, thereby justifying an award of attorney's fees. *Metric & Multistandard Components v. Metric's, Inc.*, 635 F.2d at 716; *Playboy Enterprises, Inc. v. Baccaret Clothing Co., Inc.*, 692 F.2d 1272, 1276 (9th Cir.1982). Documentation of Ford's reasonable attorneys' fees and costs should be submitted to the court within 30 days of the date of this order, at which time the court will review the request for attorneys' fees in more detail.

■ Despite the court's finding of willfulness on the part of these defendants, the court is not convinced that increased damages are appropriate. While the court may increase damages up to three times the amount of actual damages "according to the circumstances of the case", such increased damages "shall constitute compensation and not a penalty." 15 U.S.C. § 1117; *Metric & Multistandard Components v. Metric's Inc.*, 635 F.2d at 715. Under the present circumstances, the court in its discretion declines to increase Ford's award of actual damages.

## CLAIM OF RACKETEERING AND CORRUPT PRACTICES

Ford, for its final claim for relief, seeks to invoke the private civil damages of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964. With respect to this claim, Ford alleges that all the various defendants are in violation of § 1962(c), which prohibits the conducting of an enterprise's affairs through a pattern of racketeering activity.[31] Specifically, Ford contends that defendants have

---

**30.** Section 35, 15 U.S.C. § 1117, was amended in October 1984 to include a provision for mandatory treble damages in particular cases. Those mandatory damage provisions, however, apply prospectively only and thus do not apply to this case, which was filed in June 1984. *See Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966 (2d Cir.1985).

**31.** 18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

engaged in a fraudulent scheme through their marketing, sales, and distribution of counterfeit parts and spurious packaging.

Under 18 U.S.C. § 1964(c), a plaintiff may recover treble damages for an injury to his business or property which results from a violation of 18 U.S.C. § 1962. In order to make out a violation of § 1962(c), Ford must establish (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 255 (8th Cir.1986).

▪ Initially, the court rejects defendants' argument that Ford may not recover under civil RICO because Ford was only indirectly injured by defendants' activities. *See, e.g., Carter v. Berger*, 777 F.2d 1173 (7th Cir.1985). Based not only on Ford's lost profits but also on the injury to Ford's reputation and goodwill, the court finds that Ford has suffered injury in its business and property by reason of defendants' alleged RICO violations.

▪ The court further finds that Ford has proven the existence of an enterprise affecting interstate commerce and defendants' participation in the conduct of that enterprise. Under § 1961(4), an enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Such "enterprise" must exhibit three basic characteristics: (1) common purpose; (2) continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering. *United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.), *cert. denied* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.), *cert. denied* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

▪ The court recognizes that certain defendants may currently be in competition with one another. Nevertheless, all defendants have been associated in the past. The defendants also possessed the requisite characteristics of an "enterprise". First, the various defendants shared the common purpose of marketing, selling, and distributing automotive replacement parts on a national scale. This common purpose includes the marketing, sales, and distribution of the parts and packaging at issue in this case. Second, defendants' business relationship and activities since the late 1970's satisfy the requisite continuity of structure and personnel. As previously described, the various telemarketing defendants relied upon Hooper's warehousing business to supply the merchandise to their customers and Hooper conversely relied upon the sales of the telemarketing defendants to support his business. Third, this on-going structure was distinct from that inherent in the conduct of a pattern of racketeering. In addition to the sales of counterfeit parts and spurious Ford packaging, the defendants were engaged in the legitimate business of marketing, selling, and distributing automotive replacement parts.

The various defendants, excluding Superior Plug, Midwest, Bechthold, and Berdell,[32] actively participated in the "enterprise". *See Bennett v. Berg*, 710 F.2d 1361, 1364 (8th Cir.), *cert. denied* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). The corporate defendants engaged in the actual activities challenged by Ford, and the individual defendants controlled and managed such activities by their respective corporations.

While Ford has established the existence of an enterprise and the defendants' participation in the conduct of that enterprise, it has failed to establish the essential "pattern of racketeering activity". The court's reasoning with respect to this determination is two-fold. First, the court concludes

---

**32.** The court has previously determined that, on the evidence presented, the conduct by these defendants was insufficient to establish liability.

Such findings and analysis are incorporated in the court's RICO analysis.

that defendants' actions do not constitute the requisite "pattern" of unlawful activity. Second, the court finds Ford's proof is insufficient to establish that defendants' conduct constituted "racketeering activity".

Assuming for present purposes that defendants' conduct amounted to "racketeering activity", the court is not convinced that such conduct satisfies the "pattern" requirement. The only RICO provision giving any content to the concept of "pattern" is § 1961(5), which "requires at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). As the Supreme Court noted, the courts have failed to develop a meaningful concept of "pattern", thereby contributing to the expansive potential of RICO's application. *Sedima, S.P.R.L. v. Imrex Co.,* 105 S.Ct. at 3287. Although admittedly in dicta, the Supreme Court stated that it is the "factor of *continuity plus relationship* which combines to produce a pattern" of racketeering activity. *Id.,* 105 S.Ct. at 3285 n. 14 (emphasis in original). Moreover, the Court stressed that RICO is not applicable to isolated fraudulent activity:

> As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added)....

*Sedima, S.P.R.L. v. Imrex Co.,* 105 S.Ct. at 3285 n. 14.

■ After *Sedima,* numerous federal courts have addressed the "pattern" requirement and have responded to the challenge presented by the Supreme Court's dicta. Under the guidance of *Sedima,* these courts have essentially attempted to limit the expansion of civil RICO to cover all general business fraud cases. More specifically, the courts have emphasized that *Sedima's* "continuity" element requires that the predicate racketeering acts must have occurred in different criminal episodes. *Frankart Distributors, Inc. v. RMR Advertising, Inc.,* 632 F.Supp. 1198, 1200 (S.D.N.Y.1986). In other words, the "pattern" element requires repeated criminal activity, not merely repeated acts to carry out the same criminal scheme. *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831 (N.D.Ill. 1985).

This restrictive interpretation of "pattern" was endorsed by the Eighth Circuit in *Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1986), and reaffirmed by that court's decision in *Holmberg v. Morrisette,* 800 F.2d 205 (8th Cir.1986). In *Superior Oil,* the Eighth Circuit held that multiple related acts of mail and wire fraud as part of a single scheme to divert natural gas from plaintiff's pipeline did not constitute the requisite "pattern" of racketeering activity.

> The actions of [defendants] comprised one continuing scheme to convert gas from Superior Oil's pipeline. There was no proof that [defendants] have ever done these activities in the past and there was no proof that they were engaged in other criminal activities elsewhere.

*Superior Oil Co. v. Fulmer,* 785 F.2d at 257.

Recognizing that the circumstances of this case present a close question, the court nevertheless concludes that defendants' activities do not amount to a "pattern" of racketeering activity.

Defendants' activities with respect to the counterfeit parts and spurious packaging is better characterized as a single, continuing scheme to "pass-off" their merchandise as genuine Ford parts.[33] Ford has failed to prove that defendants have engaged in similar fraudulent activity in the past or that defendants are engaged in other criminal activities. Although Ford has introduced a consent judgment against several of the defendants entered in a similar case involving General Motors,[34] the court cannot make the essential finding of prior "racketeering activity" on the basis of this proof alone. The consent judgment is insufficient to support a finding of prior fraudulent activity. While defendants' activity has encompassed a number of years, it is nonetheless a single scheme and does not constitute the requisite "pattern" of racketeering activity. *Superior Oil Co. v. Fulmer*, 785 F.2d 257; *Holmberg v. Morrisette*, 800 F.2d at 209–10.

As an additional and alternative ground to deny Ford's RICO claim, the court concludes that Ford has failed to establish that defendants' conduct constituted "racketeering activity". With regard to their RICO claim, Ford contends that defendants' telephone solicitations and sales were in furtherance of a fraudulent scheme and, as such, constitute multiple acts of wire fraud. Specifically, Ford contends that defendants marketed and sold the automotive parts at issue as genuine Ford parts, using the OEM[35] designation and Ford Numbering System.

Under RICO, "racketeering activity" includes violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). 18 U.S.C. § 1961(1). To establish the predicate offenses of wire fraud or mail fraud, Ford must prove (1) a scheme to defraud on the part of defendants; and (2) interstate mailings or wire communications in execution of that scheme. *United States v. Vardell*, 760 F.2d 189, 190–91 (8th Cir.1985); *United States v. Pritchard*, 773 F.2d 873, 876 (7th Cir.1985), *cert. denied* —— U.S. ——, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986).

On the basis of the evidence before the court, including the defendants' invoice forms bearing the OEM designation, the court cannot say that defendants fraudulently marketed and sold the parts and packaging at issue as genuine Ford parts.[36] Ford has thus failed to show, by a preponderance of the evidence, that defendants' conduct amounted to wire or mail fraud. Consequently, Ford has failed to establish "racketeering activity" on the part of the defendants.[37]

Under the above analysis, the court necessarily concludes that Ford has failed to establish the essential elements of its civil RICO claim under 18 U.S.C. § 1964 and § 1962(c).

## MOTIONS FOR A FINDING OF CONTEMPT

Finally, the court addresses Ford's motions for an order to show cause why defendants Bechthold, Dealer's Discount Supply II, and Jobe should not be held in contempt for violations of the preliminary

---

**33.** This analysis again assumes Ford has proven the requisite "racketeering activity", i.e., the predicate acts of mail or wire fraud as alleged in this case.

**34.** *See* PX No. 10.

**35.** Ford asserts that the OEM designation means "original equipment manufacturer" and represents that such parts are replacement parts sold by the original manufacturer of the equipment for which the part is being used. While defendants' evidence contradicts Ford's evidence on the issue, the court accepts Ford's interpretation of OEM.

**36.** With respect to this issue, the court notes that the counterfeit parts sold by Dealer's Dis-

count II and Bechthold were represented to be genuine Ford parts. As to these isolated sales, however, Ford cannot establish the requisite "pattern" of racketeering activity.

**37.** The court notes that its finding on this issue does not necessarily conflict with its finding of willful infringement on the part of certain defendants. While some defendants may have sold and distributed parts and packaging knowing them to be substantially similar to Ford's trade dress and intending to trade on Ford's goodwill and reputation, the court cannot find that they affirmatively represented such merchandise to be genuine Ford parts.

injunctions previously entered in this case. On the evidence before it, the court finds that Ford has proven, by clear and convincing evidence, that these defendants are in violation of the court's preliminary injunction and thus liable for compensatory damages.

■ A party may be held in civil contempt for failure to comply with an order of the court, including a preliminary injunction. *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). While Ford must demonstrate noncompliance by clear and convincing evidence, it is not necessary to show that defendants violated the preliminary injunction willfully. *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers*, 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd* — U.S. —, 106 S.Ct. 3019, 88 L.Ed.2d 47 (1986). Substantial compliance with a court order, however, is a defense to an action for civil contempt. *General Signal Corp. v. Donallco, Inc.*, 787 F.2d at 1379 (citations omitted). "If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." *Id.* (citations omitted).

■ Ford has introduced evidence that Dealer's Discount II sold twelve electronic voltage regulators to Thompson Ford Sales of Reedsport, Oregon in April 1985. These regulators were represented as genuine MOTORCRAFT parts and distributed in packaging bearing the MOTORCRAFT trademark and Ford speeding car design. Upon return by Thompson Ford Sales, Ford tested the regulators and found them to be counterfeit. Both the automotive part and its packaging were counterfeits of genuine MOTORCRAFT parts and packaging.

Ford also introduced evidence as to a similar scenario on the part of Bechthold. According to Ford's evidence, Bechthold, through his corporation Northland Automotive Warehouse, a/k/a Mainland Automotive, sold twenty-four purportedly genuine MOTORCRAFT electronic voltage regulators to Miracle Ford of Salem, Virginia in April 1985. These regulators were also returned to Ford, tested, and found to be counterfeit.

Despite the general denials of Bechthold and Jobe, the court concludes that Ford has established by clear and convincing evidence that Bechthold, Jobe, and Dealer's Discount II violated the court's preliminary injunction, which clearly enjoined the sale and distribution of counterfeit parts and packaging. Moreover, the court finds that these defendants did not take all reasonable steps to prevent the violations. Admittedly, a non-expert may have difficulty distinguishing the genuine Ford part from the counterfeit. But these defendants implemented very few, if any, precautions to ensure the detection of counterfeit Ford merchandise.

■ Civil contempt may be either coercive, which is intended to make the recalcitrant party comply, or compensatory, which reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance. *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458 (11th Cir.1984) (citations omitted). This reimbursement to the prevailing party may include losses flowing from noncompliance and expenses reasonably and necessarily incurred in the attempt to enforce compliance. *Id.*

■ Ford has not articulated its claim for relief with respect to the motion for civil contempt and the court is unable to determine a precise amount of actual loss from defendants' sales of counterfeit parts. Nevertheless, Ford may recover its reasonable expenses, including attorney's fees, incurred in enforcement of the preliminary injunction. *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534–35 (11th Cir.1986). As in the case of the other claims for fee awards, Ford shall submit to the court, within 30 days of this order, documentation of its reasonable attorney's fees and costs. The court will then review Ford's request in more detail.

Accordingly, IT IS ORDERED that:

1. Plaintiff, Ford Motor Company, is entitled to recover its actual damages in the amount of $331,300.00 on Count 1 and Count 2 of its Complaint (copyright infringement, trademark infringement, and unfair competition) pursuant to 17 U.S.C. § 504 and 15 U.S.C. § 1117. Defendants B & H Supply, Inc., Dealer's Discount Supply II, Minnesota Dealer Supply, Inc., Autocraft Parts Supply, Inc., Accent Parts, International, Minneapolis Warehouse Supply, Inc., All-American Automotive, Inc., Tri-City Distributing, Robert Hooper, Richard Jobe, Robert Mitchell, and Mark Nelson are jointly and severally liable to plaintiff, Ford Motor Company, in the amount of $331,300.00.

2. Plaintiff, Ford Motor Company, is entitled to recover from defendants B & H Supply, Inc., Dealer's Discount Supply II, Minnesota Dealer Supply, Inc., Autocraft Parts Supply, Inc., Accent Parts, International, Robert Hooper and Richard Jobe its reasonable attorney's fees and costs pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117. Documentation of such reasonable attorney's fees and costs shall be submitted to the court, for its review, within 30 days of the date of this order.

3. All defendants shall deliver to plaintiff, Ford Motor Company, pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118, all spurious packaging and counterfeit parts, in their possession or within their control, found by this court to infringe the copyrights and trademarks of Ford Motor Company. Ford Motor Company may take possession and control of such automotive parts and packaging, together with the counterfeit parts and spurious packaging previously seized by the marshals, and dispose of all such material as Ford deems appropriate.

4. Defendants B & H Supply, Inc., Dealer's Discount Supply II, Minnesota Dealer Supply, Inc., Autocraft Parts Supply, Inc., Accent Parts, International, Minneapolis Warehouse Supply Inc., All-American Automotive, Inc., Tri-City Distributing, Robert Hooper, Richard Jobe, Robert Mitchell, and Mark Nelson, their officers, agents, employees, and all other persons acting in concert or participation with them, are enjoined from marketing, selling, distributing or otherwise using any automotive part or packaging design which this court has found to infringe the rights of Ford Motor Company in its speeding car package design, the Ford Oval, the MOTORCRAFT or FORD trademarks, and the Ford Numbering System, or any other automotive part or packaging which is copied from or confusingly similar to Ford's automotive parts and packaging.

5. Plaintiff, Ford Motor Company, is not entitled to recover its damages from defendants Superior Plug, Inc., Mid-West Automotive Dealers Supply, Inc., Phil Berdell, and Henry Bechthold and judgment shall be entered in favor of these defendants and against plaintiff.

6. Plaintiff, Ford Motor Company, is not entitled to recover under Count 3 of its Complaint (civil RICO).

7. Defendants Dealer's Discount II, Richard Jobe, and Henry Bechthold are found to be in civil contempt of this court and plaintiff Ford Motor Company is entitled to compensation for its reasonable attorney's fees and costs necessarily incurred in connection with enforcing compliance with the court's previously-ordered preliminary injunctions. Documentation of such reasonable attorney's fees and costs shall be submitted to the court, for its review, within 30 days of the date of this Order.

8. Let judgment be entered accordingly.